**Ann B. HOPKINS, Plaintiff,**

v.

**PRICE WATERHOUSE, Defendant.**

Civ. A. No. 84–3040.

United States District Court,
District of Columbia.

May 14, 1990.
Order May 25, 1990.

Douglas B. Huron, James H. Heller, Washington, D.C., for plaintiff.

Theodore B. Olson, Stephen B. Tallent, Wayne A. Schrader, Kathy Davidson Ireland, Theodore J. Boutrous, Jr., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON REMAND

GESELL, District Judge.

The firm of Price Waterhouse refused to make Ann Hopkins a partner. Gender-based stereotyping played a role in this decision. Now this Title VII case is again before this Court on remand from the Supreme Court of the United States. The Court must make a determination as to whether or not, absent sex stereotyping discrimination, Ms. Hopkins would still have been denied a partnership at the time her candidacy first came under consideration by the firm. The burden of proof rests squarely on Price Waterhouse to establish that it would have placed Ms. Hopkins' candidacy on hold, rather than vote her into the partnership, had it not permitted sex stereotyping to affect its decision-making process. *Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 1793, 104 L.Ed.2d 268 (1989).[1]

The existence of sex discrimination originally found by this Court was affirmed. However, the Supreme Court's decision reversed the holding of this Court and the Court of Appeals as to the nature of Price Waterhouse's burden. The prior decisions held that a plaintiff who has established evidence of discrimination affect-

---

1. The prior decisions are reported: *Hopkins v. Price Waterhouse,* 618 F.Supp. 1109 (D.C.Cir. 1985), *affirmed in part and reversed in part,* 825 F.2d 458 (D.C.Cir.1987); *reversed and remanded,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

ing an employment decision was entitled to relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, unless the employer proved by clear and convincing evidence that it would have made the same decision absent discrimination. Both this Court and the Court of Appeals determined that Price Waterhouse had not met this difficult burden. The Supreme Court subsequently held that the employer meets its burden if it proves this proposition only by a preponderance of the evidence.[2] Accordingly, the Supreme Court remanded for evaluation of this issue under this less exacting standard.[3]

After the mandate came down via the Court of Appeals on August 4, 1989, 1989 WL 105318, this Court held a status/scheduling conference on October 3, 1989. The Court was willing to reopen the record for further evidence in light of the lowered burden of proof, but both parties advised the Court that they wanted the decision on this fundamental remand issue resolved on the basis of the existing trial record. Thus no further evidence was produced by either side. The Court accordingly established a briefing schedule and, following receipt of briefs, heard oral argument on the burden of proof issue on November 15, 1989.

Ms. Hopkins had failed to present any proof of damages at the original trial. Because the Court of Appeals' decision directed this Court nonetheless to reopen the record to permit Ms. Hopkins to present proof of her damages, the parties were also directed to undertake damage discovery without waiting for a decision on the merits. The Court noted the clear probability that a further round of appeals would en-

sue regardless of what the Court might decide. Accordingly, discovery on damages went forward and was completed by December 15, 1989, as scheduled. Thereafter, a full trial on damages was conducted on February 28 and March 1, 1990. Post-trial briefing was completed by April 25, 1990.[4]

The Court will first resolve the burden of proof issue on the merits and then will consider appropriate monetary and injunctive relief.

### Merits

To resolve the remaining issue on the merits, the Court, after reviewing the transcript of the original trial and considering the briefs and arguments of counsel, reaches the following findings of fact and conclusions of law pertinent to the remand.[5]

(1) Price Waterhouse partners are selected annually by its Policy Board with the aid of the Board's Admissions Committee. The Admissions Committee develops statistical and other personal information concerning each candidate, inquires specifically into the factual basis of any negative comments received after requesting comments about each candidate from the entire partnership and eventually, following a full discussion by the entire Committee of each candidate proposed that year, recommends that the candidate be accepted, rejected or held over for further consideration. The Policy Board then, after full discussion of the Committee's recommendation, renders a final decision.

(2) Partnership selection is carried out conscientiously, usually after about three

**2.** As Justice Brennan's plurality opinion indicated, there is no Title VII *liability* at all, as opposed to simply no obligation to provide equitable relief, if the employer meets this burden. 109 S.Ct. at 1783, 1787 n. 10.

**3.** Preponderance of the evidence "means such evidence as, when weighed against that opposed to it, has the more convincing force" that something is more likely so than not so. Standardized Civil Jury Instructions for the District of Columbia § 2–8 (revised ed. 1985). The clear and convincing standard is much more demanding; it requires "a degree of persuasion higher than 'mere preponderance of the evidence,' but

still somewhat less than 'clear, unequivocal and convincing' or 'beyond a reasonable doubt.'" *Collins Sec. Corp. v. SEC,* 562 F.2d 820, 824 (D.C.Cir.1977).

**4.** On May 2, 1990, Price Waterhouse filed a motion to submit an additional brief calling the Court's attention to a recent Third Circuit opinion. Ms. Hopkins filed a reply on May 3, stating that she did not oppose the motion but responding to the brief. The Court granted the motion.

**5.** The facts are recited in greater detail in the prior opinions in the case.

years' employment. Individual candidates are usually nominated by partners who have directly supervised them. Selection is based on appraisal under well-identified written criteria. These same standards apply to accountants, tax specialists and candidates, such as Ms. Hopkins, involved in the less "professional" management consulting sector of the firm's activities. About twice as many candidates are rejected each year as are accepted on first consideration.

(3) Ms. Hopkins joined Price Waterhouse as a manager in 1978 and was first enthusiastically proposed for partnership in 1982 by her unit, the Office of Government Services ("OGS"). She had worked out of Washington, D.C., with temporary assignments to several other firm offices in different cities.

(4) Plaintiff's Exhibit 21 reflects comments received from partners concerning Ms. Hopkins directed to the criteria considered relevant to the selection of any partner. Along with many favorable comments, she received more negative comments than any other candidate that year. Some of these negative comments suggested sex stereotyping, while others did not.

(5) During the review of Ms. Hopkins' candidacy by the Admissions Committee it was apparent that, although there was considerable respect for her abilities and record of achievement and a recognition of the benefits she had brought to the firm, she ranked very low on her interpersonal relations. Even some partners who were most familiar with her work and were strongly urging the Committee and Board to recommend her for partnership in the interests of the firm commented pointedly on her inability to get along with staff and partners. The Chairman of the Admissions Committee testified:

> We did discuss and we did talk with the partners throughout the whole admissions process that knew Ann Hopkins best. We spoke with the partners who had dealt with her on a day to day basis, partners who had known her casually and there was a basic underlying pervasive theme in all of our discussions and

the responses that came through the partner canvas that she, in effect, was— that she had difficulty dealing with staff, relating to both the partners, the peers within the OGS group and the peers in other offices she visited and she had difficulty in relating and leading and developing staff that worked for her so it was not an isolated comment, but it was a pervasive theme that was running through the comments that ran through all the partners that had contact with her or a substantial number of partners that had contact with her.

(6) The Admissions Committee wavered between rejecting her candidacy outright or placing her on hold, but ultimately chose the hold option. After full discussion, the Policy Board adopted the Admissions Committee's recommendation. The record does not provide any detailed account of the oral discussion concerning Ms. Hopkins' candidacy within the Committee or the Board. Ms. Hopkins was informed of the hold decision in late March 1983.

(7) In Ms. Hopkins' year she was the only woman among 88 candidates for partnership. By July 1984, only seven of 662 Price Waterhouse partners were women. In Ms. Hopkins' year 19 male candidates were placed on hold (16 of these were made partner the next year), and 21 male candidates were rejected outright.

(8) Five months after the hold decision, the OGS partners decided not to repropose Ms. Hopkins for partnership. Ms. Hopkins was informed of this decision on August 6, 1983. Although she could have stayed at the firm as a senior manager, in December 1983 she submitted her resignation. On January 17, 1984, Price Waterhouse accepted Ms. Hopkins' resignation, and she left the firm.

It is established at this stage that Price Waterhouse intentionally maintained a partnership evaluation system that permitted negative, sexually-stereotyped comments to influence partnership selection. *See* 618 F.Supp. at 1118–20. Against this background, the Court must evaluate the March 1983 hold decision to determine whether Price Waterhouse has shown by a

*preponderance* of the evidence that it would still have placed Ms. Hopkins' candidacy on hold even in the absence of sexually biased evaluations.

Price Waterhouse relies heavily on the Court's original opinion, which stated, "Because plaintiff had considerable problems dealing with staff and peers, the Court cannot say that she would have been elected to partnership if the Policy Board's decision had not been tainted by sexually biased evaluations." 618 F.Supp. at 1120. Price Waterhouse contends that in light of this finding, unless the evidentiary scale is in perfect balance, the preponderance of evidence must have been on its side with respect to the hold decision. This argument is advocacy, not proof.

Preponderance of the evidence still requires proof sufficient to *persuade* the finder of fact that the proposition is more likely true than not true. E. Devitt, C. Blackmar, M. Wolff, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 7–2.02 (4th ed. 1987). The Court's original statement simply reflected its conclusion that neither side had persuaded it on the disputed issue. The Court merely advanced the unremarkable observation that it could not say for certain what would have happened in the absence of sex stereotyping. The Court did not need to go further and decide which way the evidentiary scale tipped, because it was obvious that Price Waterhouse had not met the "clear and convincing" burden then applicable under then-controlling case law.

■ Although the Supreme Court's decision lowered the standard of proof, it did not shift the burden of proof. Price Waterhouse, having permitted discriminatory comments to be weighed in the hold decision when appraising Ms. Hopkins, was required to separate the good from the bad. As Justice Brennan's plurality opinion states, where the proof shows that the employer acted with an illegitimate motive, " '[i]t is fair that he bear the risk that the inference of illegal and legal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his

own wrongdoing.' " *Price Waterhouse v. Hopkins*, 109 S.Ct. at 1790, *quoting NLRB v. Transportation Management Corp.*, 462 U.S. 393, 403, 103 S.Ct. 2469–2475, 76 L.Ed.2d 667 (1983). Price Waterhouse had the burden to prove something; it had to persuade the Court. This it has failed to do.

Plaintiff's expert witness at the original trial—a well-qualified social psychologist specializing in sex stereotyping issues—testified that sexual stereotyping can lead to negative judgment of women in traditionally male-dominated organizations. She expressed her expert opinion that some Price Waterhouse partner comments about Ms. Hopkins were influenced by sex stereotypes and concluded that stereotyping "played a major determining role" in the firm's decision on Ms. Hopkins, although the precise effect stereotyping had on the decision could not be determined. It was apparent from the testimony that disentangling stereotyping from fact is difficult. Stereotyping may be conscious or unconscious, and a negative fact may be expressed in words that imply stereotyping and yet be wholly nondiscriminatory.

Thus the trial record left uncertainty on the point now at issue, and Price Waterhouse was directly challenged by the remand to prove that it was more likely than not that it would have put Hopkins' candidacy on hold even in the absence of sex stereotyping.

The record does not identify each sexually stereotyped negative comment, nor does it show what weight these comments had on the decision. Moreover, the Court has been provided with no guidance to enable it to differentiate between all sexually stereotyped comments and comments not influenced by stereotyping. The subtle influence of sex upon a person's perceptions may vary with each observer and play both an unconscious and conscious role in influencing actions taken. Any judge, male or female, deciding the issue presented on remand based on mere advocacy without benefit of expert guidance or even opportunity to examine the partners suspected of bias would be subject to serious criticism.

Proof, not merely an invitation to guesswork, was required.

Price Waterhouse could have presented testimony from an expert after presenting more detailed background facts concerning Ms. Hopkins' relations with staff and peers, thus providing some basis for this Court to make appropriate findings. Nothing of this kind is available in the record. While it was apparent at the time the case was originally tried that sexist remarks were involved in the process, Price Waterhouse has made no effort to suggest guidelines for identifying sexual stereotyping. As Price Waterhouse notes, the record revealed that a number of female staff members complained about Ms. Hopkins' interpersonal skills. But Price Waterhouse does not address the issue of whether the perceptions of these women reflected male-dominated standards governing how women were supposed to behave.

Just as the Admissions Committee failed to investigate whether any of the negative partner comments on Ms. Hopkins were based on sex stereotyping, *Hopkins v. Price Waterhouse*, 618 F.Supp. at 1118–19, on remand Price Waterhouse has failed to separate out those comments tainted by sexism from those free of sexism for the purpose of demonstrating that non-discriminatory factors alone justified the hold decision. Nor have those partners making negative comments been presented for appraisal of the motivations underlying their comments. Instead, Price Waterhouse simply notes repeatedly that Ms. Hopkins was rejected because of her perceived inadequate interpersonal skills. This approach begs the question of the extent to which the perceptions of her interpersonal skills were tainted by sexism.[6]

Thus the record is insufficient to meet the difficult task of proof required, albeit under a lower standard, on remand. Price Waterhouse has not met its burden. Ms. Hopkins must be deemed to have failed to receive partnership at the time she was held over because of sex discrimination, in violation of Title VII.

### Relief

Since Price Waterhouse has failed to establish that apart from impermissible discrimination Ms. Hopkins would not have been accepted as a partner, the Court must now determine her entitlement to that status and resolve other remedial issues.

It is necessary at the outset to have clearly in mind the respects in which appellate proceedings have altered the direction of the remedial issues. This, in turn, requires the Court to resolve an issue concerning the force of the Court of Appeals' 1987 decision in this case which decided certain issues before the Supreme Court's limited review.

Not all of the elements of the Court of Appeals' decision were presented by certiorari to the Supreme Court. The Supreme Court's decision in this case reversed and remanded, but did not vacate all rulings by the Court of Appeals in its 1987 decision. In its August 4, 1989, mandate to this Court in the wake of the Supreme Court's decision, the Court of Appeals vacated this Court's "judgment" as well as the Court of Appeals' earlier August 1987 "mandate." The August 1987 mandate had remanded to this Court for proceedings in accordance with the Court of Appeals' decision. Price Waterhouse points out that the Court of Appeals generally uses the term "mandate" to refer to its judgment *and* its opinion, *see City of Cleveland v. Federal Power Commission*, 561 F.2d 344, 347 n. 25 (D.C.Cir.1977); Handbook of Practice and

---

6. Price Waterhouse also focuses on a sentence in the Court's original opinion stating that Ms. Hopkins' "conduct provided ample justification for the complaints that formed the basis of the Policy Board's decision." This sentence, however, was part of the Court's discussion of Ms. Hopkins' claim that the criticisms of her interpersonal skills were fabricated and prior to the Court's discussion of the sex stereotyping issue. The Court was referring to Ms. Hopkins' conduct as viewed by Price Waterhouse partners and had not yet addressed the issue of whether the views of those partners were tainted by conscious or unconscious sex stereotyping. The Court of Appeals has already concluded that this sentence in this Court's original opinion did not require a decision in favor of Price Waterhouse, at least under the "clear and convincing" standard. 825 F.2d at 471–72.

Internal Procedures, United States Court of Appeals for the District of Columbia Circuit, XII (2) (August 1, 1987); Fed.R. App.P. 41(a). Accordingly it suggests that the 1987 opinion has been voided and that even on those issues not appealed and thus not addressed by the Supreme Court, this Court is free to disregard the earlier holdings of the Court of Appeals and decide the case at this stage without reference to those holdings.

Price Waterhouse's position will not be sustained. The Court is not convinced that, in vacating its earlier "mandate," which directed this Court to proceed in accordance with the Court of Appeals' prior mandate, the Court of Appeals intended to vacate its judgment on issues that the Supreme Court did not address. The Court of Appeals' action is admittedly somewhat confusing. When the August 1989 mandate came down, the Court repeatedly pressed counsel to seek clarification from the Court of Appeals. The parties chose not to do so.

As a matter of common sense and judicial economy, the Court of Appeals had no reason to vacate aspects of the decision dealing with remedy which were analytically unrelated to the decision on liability. The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). This doctrine is "an expression of good sense and wise judicial practice." *Melong v. Micronesian Claims Commission,* 643 F.2d 10, 17 (D.C.Cir. 1980). Here, where there are no new facts or intervening authority that would provide a basis for questioning crucial unappealed holdings by the Court of Appeals on the same factual record, the Court sees no logical basis for upsetting them.

Finally, it is worth noting that the Court of Appeals' decision in *Hopkins* has been repeatedly cited in this Circuit, in every case on the precise issue—constructive discharge—that Price Waterhouse now wants to avoid.[7] Although all but one of the opinions citing *Hopkins* was issued prior to the issuance of the Court of Appeals' August 1989 mandate, it would be difficult to argue that they are no longer good authority on the constructive discharge issue because a wholly distinct aspect of an opinion they cite was reversed by the Supreme Court. The Court also notes that the Court of Appeals declined to rehear *Hopkins* en banc, and no subsequent case in this Circuit has criticized the Court of Appeals' judgment in that case. If the unappealed findings by the Court of Appeals' reflect a legal standard for purposes of other cases, surely this Court is bound to comply. In so doing this Court is well aware of the far-reaching implications this has with respect to remedy in this case.

■ Following the original trial, this Court concluded that Ms. Hopkins was not entitled to partnership or to back pay because she had failed to prove that she was constructively discharged. 618 F.Supp. at 1121. The Court of Appeals reversed on this point, holding that Ms. Hopkins was constructively discharged when OGS decided not to repropose her. 825 F.2d at 472–73. As Justice Brennan noted, Price Waterhouse did not appeal this holding to the Supreme Court, 109 S.Ct. at 1781 n. 1. This Court is bound by it.

Price Waterhouse argues that the Court of Appeals' finding on constructive discharge was predicated on that court's erroneous view of the liability issue. But there is no logical reason to believe that the constructive discharge finding was in any way dependent on a "clear and convincing" evidence requirement at the liability stage. The issues are totally distinct. Nothing in the Supreme Court's decision suggested

---

7. See *Katradis v. Dav–El of Washington, D.C.,* 846 F.2d 1482, 1485 (D.C.Cir.1988); *Simpson v. Federal Mine Safety & Health Review Commission,* 842 F.2d 453, 462 (D.C.Cir.1988); *Dashnaw v. Secretary of Transportation,* —— WL ——, 1989 U.S.Dist. LEXIS 10742 (D.D.C. Sept. 11, 1989); *Pope v. Local 400,* 1988 WL 117570, 1988 U.S.Dist. LEXIS 16480 (D.D.C. Oct. 24, 1988); *Palmer v. Barry,* 1988 WL 104951, 1988 U.S.Dist. LEXIS 17343 (D.D.C. Sept. 30, 1988); *DeMarco v. Thomas,* 1988 WL 36132, 1988 U.S.Dist. LEXIS 12315 (D.D.C. April 8, 1988).

that the remand on liability had any implication whatsoever for the substance of the Court of Appeals' findings on remedy.[8]

This Court also found that Ms. Hopkins *had* established entitlement to claim for back pay from the date she would have been elected partner had she not been held, July 1, 1983, until her January 17, 1984, resignation. However, the Court concluded that it had no basis for granting such relief because no proof was presented as to the compensation Ms. Hopkins would have received as a partner, owing to the fact that the parties agreed, without consulting the Court, to defer resolving the back pay issue until liability was resolved. 618 F.Supp. at 1121. The Court of Appeals, holding that this Court erred in penalizing Ms. Hopkins for conduct by counsel for both sides, reversed on this point as well, 825 F.2d at 473, and the Supreme Court was not asked to address this issue. Once again, this Court is bound.

Thus Ms. Hopkins, having now the benefit of her constructive discharge, may claim for back pay, both before and after her resignation from Price Waterhouse, without limitation, except as governed by the equitable rules of mitigation, and she may press her claim to be made a partner by court-ordered injunction, effective when she was held over. The latter claim will be addressed first.

*Partnership*

Ms. Hopkins asks for an order directing Price Waterhouse to "invite" her to be a partner. She insists this has always been her goal, but Price Waterhouse has equally insisted it does not want her as a partner.

■ Whether the Court should force Price Waterhouse to make Ms. Hopkins a partner presents a difficult and unresolved issue. It involves an appeal to the Court's discretion, but the Court's authority to so direct is clear. *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), firmly established that partnership admission decisions are subject to the reach of Title VII. While *Hishon* did not involve an order directing that the claimant be made a partner, because the claimant was not seeking such relief, the reasoning of *Hishon* provides this Court ample authority to order partnership in the circumstances presented. If, as *Hishon* held, Title VII liability may be premised on denial of partnership, then there is no logical reason that the full range of Title VII remedies aimed at making the claimant whole are not appropriate.[9]

---

**8.** The Court of Appeals' finding of constructive discharge has greatly elevated the import of the March 1983 hold decision. No proof was presented at the original trial to the effect that Price Waterhouse assured any employee that partnership was automatic after a stated period of years if work performance was at a certain level. A holdover was shown to be part of the process by which the firm attempted to correct or minimize a perceived deficiency. Indeed, 16 of the 19 candidates put on hold along with Ms. Hopkins in 1983 made partner the next year. Thus this Court was then of the mistaken view that a group of partners was entitled to assist those seeking partnership by attempting to iron out clear deficiencies, even if some partners made negative comments which suggested antipathy to assertive females. The Court's fundamental concern was not with the preliminary hold decision but with Price Waterhouse's overall intentional maintenance of a discriminatory partnership selection process.

**9.** Price Waterhouse presses the point that the wrong alleged by the claimant in *Hishon* was the refusal to *consider* her for partnership, whereas Ms. Hopkins, in the present posture of the case, is protesting a denial on the merits of her candidacy by means of the hold decision. Price Waterhouse suggests that the most *Hishon* implied was that this Court has the power to order Price Waterhouse to reconsider her candidacy, not to predetermine the merits by ordering the firm to make her a partner. However, Price Waterhouse's premise is wrong. In *Hishon* itself, the partnership had previously rejected the claimant's candidacy, and there was a factual dispute, unresolved below and explicitly not reached by the Supreme Court, as to whether the partnership actually reconsidered the claimant's candidacy the next year or simply declined to act on it. 467 U.S. at 72 n. 1, 104 S.Ct. at 2232 n. 1. While the *Hishon* opinion speaks in places about the denial of partnership *consideration,* elsewhere it talks about *"advancement to partnership"* as an employment opportunity giving rise to Title VII liability. 467 U.S. at 73, 104 S.Ct. at 2232. Moreover, in the *Hopkins* decision itself, the Supreme Court plurality, citing *Hishon,* reiterated that "[d]ecisions pertaining to *advancement to partnership* are, of course, subject to challenge under Title VII." 109 S.Ct. at 1781 n. 1 (emphasis added).

In deciding whether to exercise its discretion to make Ms. Hopkins a partner, the Court has weighed a number of factors. The Court of Appeals for this Circuit recently reiterated that

District Courts must strive to grant "the most complete relief possible" in cases of Title VII violations. *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 764 [96 S.Ct. 1251, 1264, 47 L.Ed.2d 444] (1976). In particular, the courts must make the victim "whole" by " 'plac[ing him], as near as may be, in the situation he would have occupied if the wrong had not been committed.' " *Albemarle Paper Co. v. Moody,* 422 U.S. [405] at 418–19 [95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) ] (quoting *Wicker v. Hoppock,* 73 U.S. [6 Wall.] 94, 99, 18 L.Ed. 752 (1867)).

*Lander v. Lujan,* 888 F.2d 153, 156 (D.C. Cir.1989).

▮ In light of this controlling law, ordering Price Waterhouse to make Ms. Hopkins a partner would appear to be the appropriate remedy unless some factor makes such an order inequitable or otherwise inappropriate. The Court finds that no significant factor of this kind exists.

The fact that Price Waterhouse opposes her admission to the partnership cannot control. Although a clear likelihood of extreme workplace hostility and disruption may influence a court to deny reinstatement, *see Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1347 (9th Cir.1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988), this is not such a case and "[a] district court's discrimination remedy cannot turn on the employer's preferences." *Lander v. Lujan,* 888 F.2d at 158.

Price Waterhouse has traditionally sought to function as a partnership. As it has expanded into a national concern providing a diversity of accounting and non-accounting services at more locations to varying businesses, the number of partners has now reached approximately 900 spread out over some 90 offices in the United States.[10]

There is no indication that Price Waterhouse has placed a ceiling on its number of partners. Committees selected by the partners run the firm and, indeed, at this point only a small percentage of the partners have ever even met Ms. Hopkins. Price Waterhouse lacks the intimacy and interdependence of smaller partnerships, so concerns about freedom of association have little force.

Ms. Hopkins is not an accountant. If she becomes a partner she will function, as do some other partners, in the less exacting non-accounting sector of the firm's activities and will probably be subject to accountant supervision. Partnership, particularly for a non-accountant in this widely scattered enterprise, carries increased pay and opportunity. It has less to do with status within the firm than it does with status in the eyes of outside observers. True status within the firm has to be earned. For one in Ms. Hopkins' circumstances partnership is a promotion, the ultimate significance of which depends on her subsequent performance. Since in this instance money, not significant influence in the firm's affairs, appears to be initially involved, the discriminatory condition points toward exercising discretion to make her a partner, which will provide greater opportunity.

Ms. Hopkins had the necessary skills to be a management consulting partner. There was little question as to this point among the Price Waterhouse partners in 1983. Price Waterhouse has offered only unproven speculation in support of its claim that changing technology in her field—big computer systems—has rendered Ms. Hopkins less capable of adequate performance.

Ordering Price Waterhouse to simply reconsider Ms. Hopkins for partnership would be futile and unjust, because the testimony of Price Waterhouse's chairman at the relief trial suggested that the deck is stacked against her. Price Waterhouse plainly does not want her and would not

---

**10.** Price Waterhouse's U.S. operation is one of 26 components worldwide of the Price Waterhouse World Firm.

voluntarily admit her. Partnership, not simply a new vote, is the logical remedy, given the finding that Ms. Hopkins was likely to have been made a partner if not for unlawful discrimination.

Since Ms. Hopkins' claim that partnership was always her objective cannot be tested, the alternative of front pay for the rest of Ms. Hopkins' business life does not appear to make her whole and, in any event, might well provide a wholly unwarranted windfall. The Court cannot determine whether she will be a successful, inadequate or superior partner. Nor can it determine how factors affecting her health, availability or the firm's own fortunes will impinge on her earnings. In addition, the Court is skeptical as to whether monetary relief alone provides a sufficient deterrent against future discrimination for a group of highly-paid partners. Given these considerations, equity favors the course that will most vindicate the purpose of the sex discrimination statute, consistent with established national policy.

The Court will order that Ms. Hopkins be made a partner of Price Waterhouse effective July 1, 1990. Upon admission, Price Waterhouse must grant Ms. Hopkins sufficient partnership shares so that she will receive during the Price Waterhouse fiscal year (July 1, 1990 to June 30, 1991) the average compensation given management consulting partners admitted on July 1, 1983. Price Waterhouse shall in respect to any collateral benefits treat Ms. Hopkins as if she had been admitted to the partnership on July 1, 1983. Price Waterhouse will be enjoined from retaliating against her for having brought this case or for having pursued her full remedies.

It is, indeed, a strained partnership relationship that lies ahead in the immediate future. Ms. Hopkins' perception of her mistreatment, on the one hand, and her conduct during the hold period, on the other, will require mutual accommodation.

*Back pay*

Back pay must now be considered. Ms. Hopkins left Price Waterhouse in January 1984. She must be deemed to have become a partner as of July 1, 1983, for purposes of computing lost back pay. Between July 1, 1983, and July 1, 1990, she would theoretically be entitled to the present value of the average level of compensation received by the partners in her class who were not passed over, less the compensation she did receive during the period, provided she adhered to her obligation to mitigate.[11] Ms. Hopkins' expert estimates the amount owed, with interest, to be $682,481.

Upon leaving Price Waterhouse in January 1984, Ms. Hopkins established her own consulting firm, which she later incorporated as The Hopkins Company, Inc. She continued with her own business until mid–1987, when she sought full-time employment with one of her clients, the International Bank for Reconstruction and Development (World Bank). She became a senior budget and policy review officer at the World Bank in September 1988 and now earns approximately $92,500 annually.

The following table compares the stipulated average annual earnings for Price Waterhouse management consulting partners admitted July 1, 1983,[12] with Ms. Hopkins' actual earnings. These figures form the basis of her back pay claim.

| Fiscal Year [13] | Average partner | Ms. Hopkins | Net loss |
| --- | --- | --- | --- |
| 1984 | $107,157 | $ 80,015 | $ 27,142 |
| 1985 | $111,000 | $ 56,112 | $ 54,888 |
| 1986 | $124,240 | $ 54,299 | $ 69,941 |

**11.** The Court recognizes that constructive discharge is essentially one aspect of mitigation. However, the Court of Appeals' reversal of this Court's finding that Ms. Hopkins was not constructively discharged does not free this Court of its obligation to consider whether Price Waterhouse has demonstrated that Ms. Hopkins failed to mitigate in other ways.

**12.** The parties have excluded "extreme cases" from their stipulated figures.

**13.** The Price Waterhouse fiscal year is July 1 to June 30, e.g. fiscal year 1984 is July 1, 1983, to June 30, 1984.

| Fiscal Year | Average partner | Ms. Hopkins | Net loss |
|---|---|---|---|
| 1987 | $159,265 | $ 68,842 | $ 90,423 |
| 1988 | $176,420 | $ 45,524 | $129,896 |
| 1989 | $172,957 | $ 67,106 | $105,851 |
| TOTAL | $851,039 | $372,898 | $478,141 [14] |

Unfortunately, here again, there are sharp factual and legal disputes that have invaded these relatively undisputed, simple computations, thus creating another fiercely fought lawsuit within a lawsuit. Price Waterhouse has presented significant evidence challenging Ms. Hopkins' claim that during this long, uncertain period she took reasonable steps to mitigate her loss of partnership.

■ The applicable law of mitigation must guide the Court. Pursuant to 42 U.S.C. § 2000e–5(g), courts are directed to reduce a Title VII plaintiff's back pay award by "[i]nterim earnings or amounts earned with reasonable diligence." This provision incorporates into Title VII law the traditional common law obligation to mitigate damages. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982). The claimant is not obliged to "go into another line of work, accept a demotion, or take a demeaning position," but must "use reasonable diligence in finding other suitable employment." *Id.* at 231, 102 S.Ct. at 3065. The employer has the burden of proving inadequate mitigation. *Sellers v. Delgado Community College,* 839 F.2d 1132, 1138 (5th Cir.1988); *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1234 (7th Cir.1986).

■ On the surface it appears that Ms. Hopkins mitigated damages from July 1983 until her January 1984 resignation from Price Waterhouse. Although she made no effort to look for outside employment in this period, it was not unreasonable for her to take the time to evaluate her career potential and consider whether she could obtain a partnership or comparably remunerative position elsewhere or whether instead her best option was to remain at Price Waterhouse as a senior manager. Indeed, the general rule is that staying at one's present position, unless or until there is constructive discharge, is part of the duty to mitigate. *Clark v. Marsh,* 665 F.2d 1168, 1173 (D.C.Cir.1981).

However, since the Supreme Court concluded in *Ford Motor Co., supra,* that the statutory duty to mitigate arises from traditional common law doctrines, the nature of the wrong committed by a defendant does not grant the harmed plaintiff carte blanche to hold defendant necessarily accountable for all the consequences where discharge is forced. Equity is the creature of experience tempered by common sense:

> [I]t is important that the rules for awarding damages should be such as to discourage even persons against whom wrongs have been committed from passively suffering economic loss which could be averted by reasonable efforts, or from actively increasing such loss where prudence would require that such activity cease.... In short, what the injured person can do at moderate expense or with reasonable exertions to minimize the loss or injury, he must do, or bear the risk of his inaction.

C. McCormick, *Handbook on the Law of Damages* §§ 33–34 (1935).

■ In this case, Ms. Hopkins' unreasonable intentional conduct following the hold decision—and prior to the date she could have been made partner—was inconsistent with her duty to mitigate. Soon after the hold decision, in April 1983, Ms. Hopkins arranged a luncheon date with an OGS partner, Donald Epelbaum. The evi-

---

**14.** Additional lost back pay for fiscal year 1990, as calculated by Ms. Hopkins' expert, plus inter- est, brings the total amount requested to $682,-481.

dence is strong that, at that luncheon, Ms. Hopkins misstated the substance of a meeting, held a few days earlier, between herself and Joseph E. Connor, the Chairman and Senior Partner of Price Waterhouse, regarding her partnership prospects. Ms. Hopkins misleadingly implied that Mr. Connor had disparaged certain partners who opposed her candidacy and that he had warned of the adverse consequences his partners might experience for opposing her the next year. Mr. Epelbaum felt immediately that Ms. Hopkins had misrepresented Mr. Connor's position, because he knew it was not Mr. Connor's style to attempt to manipulate partnership decisions and to disparage his partners to a non-partner employee. Mr. Connor's deposition account of this meeting differed markedly from the account Ms. Hopkins apparently gave Mr. Epelbaum. Ms. Hopkins' misrepresentation of Mr. Connor's views was a key factor influencing Mr. Epelbaum to withdraw his previously strong support for Ms. Hopkins. The Court previously found that the decision of Mr. Epelbaum and one other partner to withdraw their support resulted in OGS's nondiscriminatory decision not to re-propose Ms. Hopkins. 618 F.Supp. at 1115.

The fact that it was unlawful discrimination that put Ms. Hopkins in a position where she apparently misrepresented events does not relieve her of responsibility for the damage caused by her misrepresentation. The Court cannot gauge whether or not, absent this misrepresentation, Ms. Hopkins would have been reproposed and voted into the partnership. The Policy Board, in its initial consideration, struggled to decide between a hold and an outright denial, not between a hold and admission. On the other hand, there is little reason to believe the hold was a cynical gesture; 16 of the 19 candidates placed on hold with Ms. Hopkins in 1983 made partner in 1984, and in her case the decision to hold her over appears to have been a considered business decision that her talent justified giving her candidacy another look. It is clear from the record that she was given a genuine chance to demonstrate her ability to overcome her differences in interpersonal relationships. Moreover, prior to her

lunch with Mr. Epelbaum, Ms. Hopkins' support within OGS remained strong. The Court concludes that Price Waterhouse has offered significant evidence that Ms. Hopkins' own intentional conduct materially prevented a fair test of her performance during the hold period and that she herself created a condition which removed any possibility that she would be accepted as a partner after the hold. This was a breach of her duty to mitigate.

The Court is not suggesting that a subsequent nondiscriminatory action can relieve a Title VII defendant of liability for an earlier discriminatory act. The Court's point is that Ms. Hopkins intentional behavior may well have led to her failure to be further considered for partnership and she might otherwise have prevailed. This factor cannot be wholly ignored.

Because of her own conduct the question whether she would or would not have overcome her interpersonal difficulties was never put to a test. Equity, which has long recognized that a claimant must be free of fault, dictates that she must be deemed to have forfeited any back pay claim for the fiscal year 1983–1984.

The Court must next consider mitigation in the fiscal years after Ms. Hopkins had left Price Waterhouse.

▆▆▆ Whether she worked or not after June 30, 1984 or whether she did different work is not the point. Under the principles that govern computation of back pay she is entitled only to the present value of the difference between what she would have earned as a Price Waterhouse partner and what she could have earned if she had made a reasonable effort to obtain similar work or employment.

The Court finds that she failed to make a reasonable effort to obtain similar employment during the years after leaving Price Waterhouse when opportunities elsewhere clearly existed.

Price Waterhouse introduced evidence from job search specialists and principals at various firms that in 1984, after Ms. Hopkins left the firm, there was a significant demand both locally and nationwide for

management consultants at Big Eight and other accounting firms, management consulting firms, and within large businesses. Given her extensive successful experience in the management consulting area, it appears that Ms. Hopkins would have been a solid candidate for a high-paying position at many such firms. Because Price Waterhouse is a national firm that regularly asks and expects its partners to transfer offices, Ms. Hopkins' duty to mitigate had to include a willingness to consider jobs that would or might take her out of the Washington area.[15]

There is ample proof that Ms. Hopkins failed to make a reasonable, conscientious effort to work at her calling at a level available to her which would satisfy her duty to mitigate damages. It appears from the evidence that she over-emphasized her status in her own mind and chose work accordingly—first taking the risks of a new business venture and then turning to the relatively noncompetitive atmosphere of government service. She was simply not interested in the private sector except as a principal and found no immediate or guaranteed partnership available among those who had more remunerative work to offer in her field. So long as partnership eventually remained somewhat conjectural, she was not interested. Vindication dominated her thinking and kept her earnings below what she could have earned by reasonable effort in her field. There has never been any serious question raised as to her special competence, energy and effectiveness in her chosen field and there were numerous opportunities open to her in fiscal year 1984–85 and thereafter, both in Washington, D.C. and elsewhere.

The Court realizes that Ms. Hopkins' quest may have been hampered by the publicity created by her filing of this lawsuit, which highlighted her denial of partnership and resignation. A placement specialist retained by Price Waterhouse acknowledged that he counsels job seekers to try to avoid mentioning to employers lawsuits they have filed against former employers. In addition, although approximately 30 of Price Waterhouse's former managers were made partner at other Big Eight firms in the years 1980–87, only four of those had actually been rejected for partnership by Price Waterhouse. During that period, Price Waterhouse had rejected more than 100 partnership candidates. Thus, Ms. Hopkins' potential for partnership elsewhere was speculative. However, the fact is that she made almost no attempt to test the waters, let alone actively pursue a position comparable to that which she had successfully held at Price Waterhouse.

Ms. Hopkins' single contact with a Big Eight employer after her departure from Price Waterhouse, for example, demonstrated her unwillingness to make a reasonable attempt to obtain a comparable job: She abruptly left a 1984 meeting she had arranged at a restaurant with William Beach, a partner at Touche Ross, when Mr. Beach indicated that if his firm made her an offer, it would be at the senior manager level, with partnership consideration likely to be on a "relatively fast track," rather than immediate. Ms. Hopkins had worked at Touche Ross for three and a half years prior to working at Price Waterhouse. Mr. Beach testified that neither Ms. Hopkins' failure to make partner at Price Waterhouse, nor the resulting litigation, nor her age would have disqualified her from partnership consideration at Touche Ross. A reasonable effort to obtain a position would have included a willingness to enter as an employee, so long as partnership consideration in the reasonable future was promised.

Ms. Hopkins never formally applied for a management consulting job at any firm. She did not send her resume around town or around the country. She also made almost no effort to work with executive search firms to locate a suitable position. She rejected at least two offers of employment with smaller firms, where the compensation offered was not comparable to that of a Price Waterhouse partnership but was comparable to her final Price Water-

---

**15.** Mr. Connor testified that while Price Waterhouse does not require its partners to transfer, refusal to do so can count strongly against a partner in the eyes of more senior partners, sometimes resulting in departure from the firm.

house salary of $70,000. Ms. Hopkins mentioned to a number of contacts that she was looking for work and occasionally glanced at the newspaper want ads, but she did not make a concerted effort to find a job. She was sophisticated, informed and competent but made no genuine try to make herself available.

Ms. Hopkins testimony was that she did not focus on obtaining another position because she put her energy into establishment of her own business. Some Title VII authority holds that self-employment can provide sufficient damage mitigation if establishing one's own business was a reasonable alternative to seeking other comparable work. *See Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1005 (3rd Cir. 1988); *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1471 (11th Cir.1985). Moreover, Price Waterhouse's expert testified that it would have taken Ms. Hopkins two to four years after leaving Price Waterhouse to earn a salary comparable to what she would have been making as a Price Waterhouse partner. Nevertheless, Price Waterhouse cannot be held fully responsible for the lost back pay that accumulated as a result of Ms. Hopkins' personal decision to assume the risks and benefits of a solo business without making any reasonable effort even to consider alternatives by seriously seeking to obtain high-paying employment in her field. *Cf.* 5 A. Corbin, *Corbin on Contracts* § 1095 at 518 (1964).

Finally, the Court must consider the effect of Ms. Hopkins' 1988 decision to abandon her business and accept a job with the World Bank. The evidence indicates that she sought steady employment not because her business was floundering but because, by her own account, her separation from her husband caused her to seek a position that was more stable in terms of both hours and cash flow. It is not enough for Ms. Hopkins to point out that her future World Bank salary is higher than that of the typical Price Waterhouse senior manager; Ms. Hopkins' prior experience at Price Waterhouse and her success in her own business put her in a position to obtain a management consultant position that paid substantially more. For whatever reason, she simply chose not to seek such a position.

The Court has concluded and so finds that because Ms. Hopkins failed to take reasonable steps to mitigate, her claim must be reduced in the following respects:

(1) No back pay for fiscal year 1983–84 will be awarded.

(2) In light of the figures presented in the case as to compensation for management consultants in the relevant period,[16] Ms. Hopkins' own salaries at Price Waterhouse and the World Bank, and her abilities, the Court finds that with reasonable effort Ms. Hopkins could have earned during each subsequent fiscal year an average of $100,000. Accordingly, her back pay award for each fiscal year shall be determined by subtracting from the average Price Waterhouse partnership salary for her class as stipulated,[17] $100,000, or her actual earnings, whichever is greater.[18]

(3) Ms. Hopkins shall receive interest accumulated from the time of her lost back pay. The interest rate shall be the municipal bond rate employed by her expert. There will be no reduction for taxes.[19]

### Injunctive relief

The Court has already noted there is need for an injunction barring retaliation.

---

**16.** *See, e.g.,* 1985 trial transcript at 115; 1990 trial transcript at 214, 286–87.

**17.** The fiscal year 1990 Price Waterhouse partnership earnings figure shall be the one supplied by Ms. Hopkins' expert.

**18.** While evidence regarding partnership benefits were clearly part of Ms. Hopkins' claim for front pay, it appears that no lost benefits were sought in connection with the back pay claim.

**19.** Price Waterhouse argues in a supplemental brief that any back pay award would not be subject to federal income taxes, citing a recently decided tax case involving damages under the Age Discrimination in Employment Act, *Rickel v. Commissioner of Internal Revenue*, 900 F.2d 655 (3rd Cir.1990). This rule has not been established in this Circuit, and there is no assurance Ms. Hopkins will not be assessed taxes.

Ms. Hopkins, however, asks the Court to direct Price Waterhouse to adopt a written policy barring discrimination against women candidates for partnership on the basis of sex and the use of sexual stereotyping in the admissions process. She asks that Price Waterhouse be required to repeat this policy in the materials distributed to the partners each year in connection with partnership admissions with a warning that those engaging in sex stereotyping may suffer a reduction in partnership share allocations. She also asks that the Court direct the Policy Board to carefully screen for sexually stereotyped comments and disregard any comments which are not clearly free of such bias. Finally, she asks Price Waterhouse to compile and annually make available to her counsel for five years "complete records relating to the partnership admissions process, including records of all comments made about women candidates, all inquiries concerning any comments that may have been reflective of stereotyping, and all actions taken with respect to partners who engaged in stereotyping or other forms of discrimination."

In a successful Title VII action, the Court has "the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (quoting *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)). However, a decree enjoining the defendant from further discrimination is not a mandatory remedy. *Johnson v. Brock*, 810 F.2d 219, 225 (D.C. Cir.1987).

An injunction of this scope and intrusiveness into the firm's partnership procedures is not justified and will be denied. It is wholly unreasonable to place the Court in a continuing monitoring role in respect to the ill-defined area of sex stereotyping which the proof shows may occur without intention and is difficult to ascertain. Both male and female partners are on notice to avoid it. This is an area of sex discrimination that must evolve through more than the experience of one obviously atypical case before affirmative injunctions that can be fairly and evenly enforced can issue with any confidence.

No final order can be issued at this juncture, because the Court lacks adequate data to compute the substantially reduced back pay to be awarded. The parties shall confer and shall submit a proposed form of order effectuating the determinations made herein by May 23, 1990.

Ms. Hopkins is entitled to her reasonable attorney fees. The parties are referred to Rule 215 of the Rules of this Court. Ms. Hopkins shall have her costs, to be fixed by the Clerk of Court.

A status conference is set for May 25, 1990, at 2:00 p.m. in Courtroom No. 6, at which time the Court will approve a final order and determine an appropriate procedure for dealing with attorney fees in the event agreement has not been promptly reached.

## ORDER

In accordance with the Court's Findings of Fact and Conclusions of Law on Remand, filed on May 14, 1990, it is hereby

ORDERED:

(1) Judgment is entered in favor of plaintiff against defendant.

(2) Defendant shall admit plaintiff as a principal in Price Waterhouse effective July 1, 1990. Upon admission, defendant shall grant plaintiff sufficient shares so that she will receive during the Price Waterhouse fiscal year (July 1, 1990 to June 30, 1991) the average compensation given management consulting principals admitted July 1, 1983, and plaintiff shall make a contribution of capital to the firm commensurate with the amount of shares so granted on the same terms that such contributions were and are made by principals admitted July 1, 1983.

(3) With respect to all collateral benefits and obligations, plaintiff shall be treated as if she had become a principal of Price Waterhouse as of July 1, 1983.

(4) Defendant shall pay plaintiff as back compensation the sum of $371,175, including interest.

(5) While there is no evidence of conduct constituting retaliation or of retaliatory motives by the defendant, in order to establish a standard by which any future claim of retaliation may be measured, defendant shall not discriminate against plaintiff because she has, by this litigation, asserted claims of unlawful discrimination by defendant.

(6) Plaintiff is awarded her costs and reasonable attorney fees, which have been settled by agreement of the parties, as reported this day in open court, for a total of $422,460.32.