Ann B. **HOPKINS**

v.

**PRICE WATERHOUSE, Appellant.**

No. 90–7099.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 7, 1990.

Decided Dec. 4, 1990.

Theodore B. Olson, Washington, D.C., with whom Eldon Olson, Arlington, Va., was on the brief, for appellant. Wayne A. Schrader, Washington, D.C., also entered an appearance for appellant.

James H. Heller, with whom Douglas B. Huron, Washington, D.C., was on the brief, for appellee.

Susan L.P. Starr, Atty., E.E.O.C., Washington, D.C., was on the brief for amicus curiae urging that the District Court's decision be affirmed.

Before MIKVA, EDWARDS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Concurring opinion filed by Circuit Judge HENDERSON.

HARRY T. EDWARDS, Circuit Judge:

This case, before this court for the second time, arises from a decision by appellant Price Waterhouse to deny partnership to one of its employees, appellee Ann B. Hopkins. We are again asked to review a finding by the District Court that Price Waterhouse's denial of partnership to Ms. Hopkins violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1988), and to assess its shaping of an appropriate remedy.

In *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), the Supreme Court clearly established that "partnership consideration may qualify as a term, condition, or privilege of a person's employment" such that Title VII will provide a cause of action if partnership is denied because of sex discrimination. *Id.* at 78 n. 10, 104 S.Ct. at 2235 n. 10. Chief Justice Burger, writing for a unanimous Court in *Hishon,* held that

> even if ... a partnership invitation is not itself an offer of employment, Title VII would nonetheless apply and preclude discrimination on the basis of sex. The benefit a plaintiff is denied need not *be* employment to fall within Title VII's protection; it need only be a term, condition,

or privilege *of* employment.... Accordingly, nothing in the change in status that advancement to partnership might entail means that partnership consideration falls outside the terms of the statute.

*Id.* at 77, 104 S.Ct. at 2234 (emphasis in original).

It is undisputed that, for professional employees like Ms. Hopkins, Price Waterhouse held out the prospect of admission to partnership as a privilege of employment. Indeed, the District Court expressly found that "[p]artnership consideration was clearly a privilege of plaintiff's employment." *See Hopkins v. Price Waterhouse,* 618 F.Supp. 1109, 1119 (D.D.C.1985), *aff'd in part and rev'd in part,* 825 F.2d 458 (D.C. Cir.1987), *aff'd in part and rev'd and remanded in part,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Moreover, decisions concerning admission to partnership were to be based exclusively on merit, taking into account a range of job-related considerations—"from practice development and technical expertise to interpersonal skills and participation in civic activities." *Id.* at 1112. The trial court found, however, that Ann Hopkins was denied partnership at Price Waterhouse in part because of sexual stereotyping, which is a form of sex discrimination under Title VII. *See id.* at 1119–20. We upheld that finding, *see* 825 F.2d at 468, as did the Supreme Court, *see* 109 S.Ct. at 1791, 1793 (plurality opinion); *id.* at 1802, 1805 (O'Connor, J., concurring in the judgment).

The Supreme Court, while agreeing that Price Waterhouse had been motivated in part by discriminatory stereotyping, remanded the case for reconsideration of Price Waterhouse's claim that the decision to deny partnership to Ms. Hopkins would have remained the same even in the absence of the proscribed discrimination. During the first trial before the District Court, Price Waterhouse was given an opportunity to show that it would have reached the same decision regarding Ms. Hopkins even absent any discrimination; however, both the trial court and this court required Price Waterhouse to make this showing by clear and convincing evidence.

In reversing on this point, the Supreme Court ruled that the District Court must determine whether, on the record before it, Price Waterhouse had shown by a *preponderance of the evidence,* that it would have denied partnership to Ms. Hopkins in any event for nondiscriminatory reasons. The Supreme Court thus remanded for reconsideration on this limited issue.

On remand, the District Court first offered to permit Price Waterhouse to introduce new evidence concerning nondiscriminatory reasons justifying the denial of partnership to Ms. Hopkins; Price Waterhouse declined this offer, choosing instead to rely on the evidence already introduced at the first trial. The trial court then reviewed that evidence and found that Price Waterhouse failed to carry the burden placed upon it by the Supreme Court. *See Hopkins v. Price Waterhouse,* 737 F.Supp. 1202 (D.D.C.1990). Having found appellant liable under Title VII, the District Court ordered Price Waterhouse to admit Ann Hopkins into the firm's partnership and to pay her $371,000 in back pay. On this appeal, Price Waterhouse challenges both the District Court's finding of liability and its remedial order that Ms. Hopkins be made a partner. We can find no merit in either of these challenges.

Price Waterhouse's argument that Title VII does not authorize a court to order elevation to partnership rests ultimately upon the untenable suggestion that *Hishon* conferred only a cause of action for the discriminatory denial of partnership and never meant to imply a corresponding remedy. We find it inconceivable, however, that the Supreme Court intended to open up a partnership's admission decisions to judicial scrutiny while placing them beyond effective judicial remedy. On this point, it is important to note that this case involves only an employee's *elevation* to partnership; it does *not* involve a party's retention of partnership or the regulation of the relationship *among* partners. Thus, we are not confronted by the concerns expressed in Justice Powell's concurring opinion in *Hishon,* in which he emphasized that the Court in *Hishon* did not reach the question

whether Title VII would protect employees after they became partners, *see* 467 U.S. at 79, 104 S.Ct. at 2235 (Powell, J., concurring); we emphasize the same point today, for we have no occasion to decide this question.

Finding no error in either the trial court's finding of liability or in its shaping of an appropriate remedy, we affirm the judgment of the District Court.

## I. BACKGROUND

Ann Hopkins joined Price Waterhouse in 1978, as a member of the professional staff in the firm's Office of Government Services ("OGS") in Washington, D.C. In this position, Ms. Hopkins was responsible for helping the firm to win and carry out management consulting contracts with federal agencies. She enjoyed a successful career in OGS and, in 1982, was proposed for partnership. In keeping with the firm's established personnel procedures, all partners who had worked with Ms. Hopkins were asked to submit written comments to the firm's Admissions Committee. These evaluations were written on so-called "long forms" by those partners who knew Ms. Hopkins well, and on "short forms" by those who had had only passing contact with her. The evaluations covered a range of considerations, including both technical skills and personal interactions. The Admissions Committee was then responsible for sorting through these forms, summarizing the various comments, and submitting recommendations to the firm's Policy Board. The Policy Board, in turn, was to decide whether to reject the candidate outright, "hold" her candidacy for another year or submit the candidate for a vote by the full partnership. *See* 618 F.Supp. at 1111–12 (recounting partnership review process).

Ms. Hopkins' record at the firm documented outstanding accomplishments as a senior manager. At the first trial in this case, the District Court found that Ms. Hopkins "played a key role in Price Waterhouse's successful effort to win a multi-million dollar contract with the Department of State." *Id.* at 1112. Moreover,

[s]he had no difficulty dealing with clients and her clients appear to have been very pleased with her work. None of the other partnership candidates at Price Waterhouse that year had a comparable record in terms of successfully securing major contracts for the partnership.... She was generally viewed as a highly competent project leader who worked long hours, pushed vigorously to meet deadlines and demanded much from the multidisciplinary staffs with which she worked.

*Id.* at 1112–13.

A number of the comments submitted by partners, however, also criticized Ms. Hopkins' "interpersonal skills," suggesting that she was sometimes overbearing and abrasive. Some of these comments went further in suggesting that these defects were especially inappropriate because Hopkins was a woman. As the Supreme Court noted in its review of this case:

One partner described her as "macho"; another suggested that she "overcompensated for being a woman"; a third advised her to take "a course at charm school." Several partners criticized her use of profanity; in response, one partner suggested that those partners objected to her swearing only "because it[']s a lady using foul language." Another supporter explained that Hopkins "ha[d] matured from a tough-talking somewhat masculine hard-nosed mgr to an authoritative, formidable, but much more appealing lady ptr candidate."

*Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1782, 104 L.Ed.2d 268 (1989) (plurality opinion) (citations omitted).

In March 1983, Price Waterhouse's Policy Board voted not to admit Ms. Hopkins as a partner. Rather than dismiss her outright, however, the Board decided to "hold" her candidacy, with the possibility that she might be reconsidered the following year. "When [Hopkins] consulted with the head partner at OGS, who was her strongest supporter and responsible for telling her what problems the Policy Board had identified with her candidacy, *she was advised to walk more femininely, talk more femi-*

*ninely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.*" 618 F.Supp. at 1117 (footnote omitted; emphasis added).

Ms. Hopkins remained at Price Waterhouse but then ran into conflicts with some of the partners. Donald Epelbaum, one of the partners in appellee's home office, accused Ms. Hopkins of misrepresenting a conversation she had had with Price Waterhouse's managing partner concerning her partnership prospects. 737 F.Supp. at 1212–13. These conflicts culminated in a decision not to repropose Ms. Hopkins for partnership the following year. Ms. Hopkins then resigned and later brought this suit.

Following the first trial in 1985, the District Court held that Ms. Hopkins had proved that sex stereotyping had infected the decisionmaking process among Price Waterhouse's partners and that Price Waterhouse could avoid equitable relief only if it could show, by clear and convincing evidence, that it would have reached the same negative decision regarding Ms. Hopkins' candidacy even absent the sex stereotyping. *See* 618 F.Supp. at 1120. The trial court went on, however, to hold that Price Waterhouse's subsequent decision not to renominate Ms. Hopkins was nondiscriminatory, *id.* at 1115, and that Ms. Hopkins' resignation was not a constructive discharge, *id.* at 1121. Consequently, the trial court held that Ms. Hopkins was not entitled to back pay for the period following her resignation. *Id.*

On appeal, a panel of this court found "ample support in the record for the District Court's finding that the partnership selection process at Price Waterhouse was impermissibly infected by stereotypical attitudes towards female candidates." 825 F.2d at 468. We also held, contrary to the trial court, that a showing by Price Waterhouse, by clear and convincing evidence, that it would have deferred Ms. Hopkins' candidacy regardless of her sex would result in Price Waterhouse avoiding Title VII liability altogether, not simply equitable relief. *See* 825 F.2d at 471–72. Finally, this court held that, on the record before the

trial court, Ms. Hopkins *was* constructively discharged when Price Waterhouse informed her that she would not be renominated; as a result, we held that any remedy to which Ms. Hopkins was entitled should cover the period following her resignation. *Id.* at 472–73. This court then remanded the case to the District Court to fashion an appropriate remedy. *Id.* at 473.

Following our initial review of this case, the Supreme Court granted certiorari and considered the case. The Court upheld the District Court's finding that sex discrimination had tainted Price Waterhouse's decisionmaking. *See* 109 S.Ct. at 1791, 1793 (plurality opinion); *id.* at 1802, 1805 (O'Connor, J., concurring in the judgment). It agreed that "a number of the partners' comments showed sex stereotyping at work," *see id.* at 1791 (plurality opinion), and stated forcefully that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group," *id.* The Court then ruled that Price Waterhouse could avoid liability if it could show—by a preponderance of the evidence—that it would have reached the same decision absent any discrimination, *see id.* at 1792 (plurality opinion); *id.* at 1796 (O'Connor, J., concurring in the judgment). Because the District Court had not evaluated the evidence by that standard, the Court remanded the case for reconsideration pursuant to the proper evidentiary standard. *Id.* at 1793 (plurality opinion).

On remand, Judge Gesell offered to allow either side to introduce new evidence on the question of liability, but both parties elected to have the District Court rule on the basis of the evidence already in the record from the first trial. 737 F.Supp. at 1204. Judge Gesell then ruled that he was not persuaded, even by a preponderance of the evidence, that Price Waterhouse would have denied Ms. Hopkins' candidacy for partnership in 1983 had Hopkins not been a woman and that Price Waterhouse was therefore liable under Title VII. *Id.* at 1206–07. In fashioning a remedy, Judge Gesell held that he was bound, by the law of the case doctrine and the law of the

circuit, to find that Ms. Hopkins had been constructively discharged by Price Waterhouse. *Id.* at 1208. Based in part on that finding, he then ordered that Ms. Hopkins be awarded $371,175 in back pay (an amount that reflected reductions on grounds of equity and inadequate mitigation), attorneys fees and a partnership in Price Waterhouse. *Id.* at 1209–17.

Price Waterhouse now presses five arguments on appeal. It argues (1) that the District Court clearly erred in finding that Price Waterhouse did not meet its burden of showing by a preponderance of the evidence that it would have deferred Ms. Hopkins' candidacy for partnership even if it had not considered Ms. Hopkins' gender; (2) that the District Court misapplied the law of the case doctrine in holding that Ms. Hopkins was constructively discharged; (3) that the District Court had no power to order partnership as a Title VII remedy; (4) that, even if the court had this remedial authority, ordering a partnership was inequitable on the facts of this case; and (5) that the District Court erred in its calculation of the back pay to which Ms. Hopkins is entitled. We find no merit in any of these contentions. Finding no error in the District Court's judgment, we affirm.

## II. Analysis

### A. *Liability*

Price Waterhouse raises two objections to the District Court's finding of liability. First, it asserts that the trial court did not carry out the Supreme Court's instruction that it reevaluate the evidence pursuant to the preponderance standard. Specifically, Price Waterhouse asserts that the trial court sidestepped its responsibility to reweigh the evidence by emphasizing Price Waterhouse's failure to produce *new* evidence suggesting that it was moved by legitimate, nondiscriminatory concerns in denying Ms. Hopkins partnership in March 1983. Second, it asserts that, even if the trial court did reweigh the evidence, it com-

mitted clear error in not being persuaded by Price Waterhouse's showing. We disagree on both counts.

■ As to Price Waterhouse's first contention, a fair reading of Judge Gesell's opinion shows that he *did* in fact "reweigh" the evidence and that he simply found it unpersuasive.[1] Judge Gesell based his finding that appellant did not carry its burden of persuasion in part on Price Waterhouse's failure to differentiate between evaluations of Ms. Hopkins that were "tainted by sexism" and those that reflected legitimate, nondiscriminatory concerns. *See* 737 F.Supp. at 1206–07. This finding could hardly have come as a surprise to Price Waterhouse. The earlier judicial opinions in this case put Price Waterhouse on notice that it was virtually impossible on the basis of the original trial record to discern the *extent* to which sex stereotyping had pervaded Price Waterhouse's evaluations of Ms. Hopkins. *See* 618 F.Supp. at 1117 (noting that plaintiff's "well qualified expert" "did not purport to be able to determine whether or not any particular reaction [to Hopkins] was determined by the operation of sex stereotypes"); 825 F.2d at 464 ("The trial judge acknowledged that it was impossible to measure the precise role sexual stereotyping had played...."). Thus, when the case returned to the trial court on remand from the Supreme Court, Price Waterhouse had reason to know that, based on the evidence it had proffered so far, the trial court was likely unable to separate out the impermissible reasons for appellant's employment decision in order to see if the reasons that remained would have led to the same result.

Price Waterhouse might have helped to tip the balance in its favor by introducing its own expert testimony or by offering some more objective evidence in support of its case. *Cf. Hopkins*, 109 S.Ct. at 1791 ("[I]n most cases, the employer should be able to present some objective evidence as

---

1. Judge Gesell prefaced his factfinding as follows: "[T]he Court, *after reviewing the transcript of the original trial* and considering the briefs and arguments of counsel, reaches the

following findings of fact and conclusions of law...." 737 F.Supp. at 1204 (emphasis added).

to its probable decision in the absence of an impermissible motive.") (footnote omitted). Nonetheless, Price Waterhouse declined the opportunity to present new evidence and chose to rest its case on the evidence previously submitted—evidence that the trial court found left the issue of liability, at best, in equipoise. *See* 737 F.Supp. at 1206.

The approach taken by Judge Gesell appears perfectly consistent with the instructions he received from the Supreme Court. The Court's plurality opinion expressly acknowledged the possibility that a court, unable to separate the permissible from impermissible motivations of an employer, would hold against the employer. Drawing an analogy to the Court's treatment of mixed-motive cases under the National Labor Relations Act, the opinion noted:

> It is fair that [the employer] bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing.

109 S.Ct. at 1790 (quoting *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983)).

Justice O'Connor, concurring in the Court's judgment, made clear that she, too, believed that it was the employer who must carry the burden of separating out the impermissible motives from the permissible, and that the decision must go to the employee should the employer fail to carry this burden:

The employer need not isolate the sole cause for the decision, rather it must demonstrate that *with the illegitimate factor removed from the calculus*, sufficient business reasons would have induced it to take the same employment action.... If the employer fails to carry this burden, the factfinder is justified in concluding that the decision was made "because of" consideration of the illegitimate factor and the substantive standard for liability under the statute is satisfied.

109 S.Ct. at 1804 (O'Connor, J., concurring in the judgment) (emphasis added).

Judge Gesell, on remand, effectively invited Price Waterhouse to identify and "remove[ ] from the calculus" those partnership evaluations that were influenced by illegitimate motivations so that the court could then assess whether the remaining legitimate reasons would have led to the same employment decision. Price Waterhouse declined the invitation, sticking instead to a view that every facially neutral evaluation was legitimate. *See* 737 F.Supp. at 1207; *see also* Brief for Appellant at 15–17; Appellant's Reply Brief at 2–3. Since the reliability of that evidence already had been properly called into question,[2] and since Judge Gesell found himself unable to separate out the illegitimate motives from the legitimate, he was therefore left unpersuaded, even by a preponderance of the evidence, that Price Waterhouse would have made the same employment decision absent discrimination.[3]

---

**2.** *See, e.g.*, 109 S.Ct. at 1783 (noting that Hopkins' expert witness suggested that sex stereotyping infected "not only ... the overtly sex-based comments of partners but also ... [facially] gender-neutral remarks").

**3.** As one commentator has aptly noted:

> Obviously, in cases such as *Hopkins*, in which the legitimate reason articulated by the employer was of such a subjective nature as to itself invite stereotyping, the employer bears the additional burden of showing that the stereotyped attitudes did not so pervade the subjective evaluation as to destroy the articulated reason's legitimacy. In cases in which such subjective factors as "interpersonal skills" are offered as the determining cause for the negative employment decision, Justice

Brennan's mandate in *Hopkins* that "the employer should be able to present some *objective* evidence as to its probable decision in the absence of an impermissible motive" should be adopted.

Radford, *Sex Stereotyping and the Promotion of Women to Positions of Power*, 41 Hastings L.J. 471, 533 (1990) (quoting *Hopkins*, 109 S.Ct. at 1791; emphasis added by author; footnote omitted).

Justice White suggested in his opinion concurring in the judgment in *Hopkins* that the employer need not produce objective evidence but may rely on its own "credibl[e]" testimony about its legitimate motivations, *see* 109 S.Ct. at 1796 (White, J., concurring in the judgment), a position the plurality found "baffling," *see id.* at 1791 n. 14. However, even under the view

As Justice O'Connor freely acknowledged, the result in a case of this sort may be "strong medicine," *see* 109 S.Ct. at 1797 (O'Connor, J., concurring in the judgment), but it is the price that employers must pay "in cases such as this one where the employer has created uncertainty as to causation by knowingly giving substantial weight to an impermissible criterion," *id.* at 1796. Therefore, we reject Price Waterhouse's contention that Judge Gesell failed to "weigh" the evidence. Judge Gesell expressly *did* review the trial record, *see* 737 F.Supp. at 1204, found that it left "uncertainty on the point now at issue," *see id.* at 1206, and, Price Waterhouse having declined the opportunity to add to the record or clarify the uncertainty, resolved that doubt against the employer. That is precisely what Judge Gesell was instructed to do.

This leaves only Price Waterhouse's alternative argument that Judge Gesell "failed to give sufficient weight to Price Waterhouse's evidence" in his reconsideration. Brief for Appellant at 15. To the extent that Price Waterhouse invites us to make our own *de novo* determination of the facts, we decline. We review Judge Gesell's findings concerning Price Waterhouse's motivations mindful of the Supreme Court's instruction that they should be set aside only if they rise to the level of clear error. *See Pullman–Standard v. Swint*, 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982). Under this standard, we can upset Judge Gesell's conclusion that Price Waterhouse failed to prove that it would have deferred Ms. Hopkins' candidacy for partnership in 1983 regardless of her sex only if that conclusion " 'is based on an utterly implausible account of the evidence.' " *Underwood v. District of Columbia Armory Bd.*, 816

F.2d 769, 774 (D.C.Cir.1987) (quoting *Bishopp v. District of Columbia*, 788 F.2d 781, 786 (D.C.Cir.1986)); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Here, we find no such flaw. To the contrary, Judge Gesell's factfinding reflected balance, deliberation and a consideration of the complete record. Therefore, we affirm the District Court's finding of liability.

### B. Finding of Constructive Discharge

■ We find no error in Judge Gesell's finding that Ms. Hopkins was constructively discharged when Price Waterhouse informed her that she would not be renominated for partnership. *See* 737 F.Supp. at 1208–09. Price Waterhouse claims that the District Court misapplied the law of the case doctrine in adhering to this court's earlier ruling on the constructive discharge question because, following the Supreme Court's reversal on the separate liability issue, this court vacated its earlier "mandate." *See Hopkins v. Price Waterhouse*, No. 85–6052 (D.C.Cir. Aug. 1, 1989) (available on Westlaw at 1989 WL 105318). Price Waterhouse argues that, by vacating its "mandate," this court vacated its earlier opinion, including the unappealed question of constructive discharge.

We agree with the District Court that Price Waterhouse is mistaken in asserting an identity between our 1987 opinion and the mandate it contained. *See* 737 F.Supp. at 1207–08. Furthermore, it is sufficient to point out that the District Court grounded its finding of constructive discharge both in the law of the case doctrine *and* in the fact that this court's earlier constructive discharge ruling has since become the established law of the circuit. *See id.* at 1208.[4]

espoused by Justice White, we can find no merit in appellant's position: Judge Gesell found that, on balance, Price Waterhouse's evidence was not sufficiently credible to satisfy its burden of persuasion. We cannot possibly say that this finding is "clearly erroneous." *See Pullman–Standard v. Swint*, 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982). When Price Waterhouse declined to introduce any new, more objective evidence to resolve the lingering

uncertainty, the District Court had no grounds to rule against appellee.

4. The District Court pointed out that six cases in this circuit have adopted the constructive discharge rule set out in this court's 1987 *Hopkins* opinion. *See* 737 F.Supp. at 1208 n. 7 (listing cases). Judge Gesell then noted: "If the unappealed findings by the Court of Appeals[ ] reflect a legal standard for purposes of other cases,

Thus, even if the trial court had not been bound by the law of the case, it was nonetheless bound by the law of the circuit. Under these circumstances, we find that, quite aside from the law of the case doctrine, the District Court acted properly in adopting this court's earlier holding on constructive discharge.[5]

## C. *Partnership as a Remedy Under Title VII*

█ Price Waterhouse also asserts that the District Court had no authority to order admission to partnership to remedy a Title VII violation. Price Waterhouse's argument is apparently that while Title VII extends far enough to protect an employee against discrimination in partnership consideration, it comes to an abrupt halt once a violation has been found, leaving the employee with the promise of fair consideration for partnership but no effective means of enforcing it. This argument seems absurd in the light of the Supreme Court's decision in *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), in which the Court held that "nothing in the change in status that advancement to partnership might entail means that partnership consideration falls outside the terms of [Title VII]." *Id.* at 77, 104 S.Ct. at 2235. Given the Court's judg-

ment in *Hishon*, and after careful review of Title VII, its legislative history and the case law interpreting it, we find that the District Court clearly acted within the bounds of the remedial authority conferred by the statute.

### 1. *The Terms of Title VII and its Legislative History*

The remedial reach of Title VII is defined broadly in section 706(g) of the statute:

> If the court finds that the respondent has intentionally engaged in ... an unlawful employment practice ... the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g) (1988). By its choice of such expansive statutory language, authorizing the courts to *"order such affirmative action as may be appropriate,"* Congress could hardly have made more plain its intention that courts exercise broad discretion in crafting effective equitable remedies for employment discrimination.[6]

surely this Court is bound to comply." *Id.* at 1208. We agree.

5. *See County of Los Angeles v. Davis*, 440 U.S. 625, 646 n. 10, 99 S.Ct. 1379, 1391 n. 10, 59 L.Ed.2d 642 (1979) (Powell, J., dissenting) ("Although a decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case, the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority if not the governing law....") (citations omitted); *Christianson v. Colt Industries Operating Corp.*, 870 F.2d 1292, 1298–99 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989); *Hill v. Western Electric Co.*, 672 F.2d 381, 388 (4th Cir.), *cert. denied,* 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982).

6. We do not accept—indeed, we can barely comprehend—appellant's argument that "[t]he plain language of Title VII makes clear that Congress did not intend to authorize the courts to create partnerships to remedy employment discrimination." Brief for Appellant at 27–28. We also

note that Price Waterhouse's "plain language" argument smacks of a similar argument that was flatly rejected by the Supreme Court in *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976):

> It is true that backpay is the only remedy specifically mentioned in § 706(g). But to draw from this fact and other sections of the statute any implicit statement by Congress that seniority relief is a prohibited, or at least less available, form of remedy is not warranted.

*Id.* at 764 n. 21, 96 S.Ct. at 1264 n. 21 (cross-reference omitted); *see also* 2 A. LARSON & L. LARSON, EMPLOYMENT DISCRIMINATION § 55.20, at 11–19 (rev. ed. 1990) ("Although Section 706(g) specifically mentions only reinstatement and hiring as two possible remedies under Title VII, the courts, in an attempt to return the victim of employment discrimination to his proper status, have also ordered promotions, transfers, mergers of segregated seniority systems, alteration or abolition of discriminatory seniority or referral systems, and other miscellaneous forms of affirmative relief.").

The statute's legislative history reinforces this unmistakable conclusion. A section-by-section analysis of the 1972 amendments to the Civil Rights Act of 1964—amendments in which Congress revised section 706(g) by adding language underscoring the trial court's discretion in crafting appropriate remedies—stressed the flexible nature of the Act's remedial provisions:

> The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible.... [T]he scope of relief ... is intended to make the victims of unlawful discrimination whole ... [and] so far as possible, [restore them] to a position where they would have been were it not for the unlawful discrimination.

118 CONG.REC. 7168 (1972). The Supreme Court has found in this language "emphatic confirmation that federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible the victims of ... discrimination in hiring." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976) (footnote omitted); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420–21, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (finding that this history "strongly reaffirmed the 'make whole' purpose of Title VII").[7]

### 2. The Case Law Construing the Remedial Authority of the Courts Under Title VII

Every indication from the case law suggests that section 706(g) is to be construed so as to authorize the courts to grant "make whole" relief to victims of unlawful discrimination. As the Court noted in *Albemarle Paper:*

> It is ... the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination. This is shown by the very fact that Congress took care to arm the courts with full equitable powers. For it is the historic purpose of equity to "secur[e] complete justice," *Brown v. Swann*, 10 Pet. 497, 503 [9 L.Ed. 508] (1836); see also *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–398 [66 S.Ct. 1086, 90 L.Ed. 1332] (1946). "[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946).

422 U.S. at 418, 95 S.Ct. at 2372; *see also Lander v. Lujan*, 888 F.2d 153, 156 (D.C. Cir.1989) (emphasizing importance of flexible, complete relief under Title VII). The obvious point here is that, to the fullest extent possible, Title VII authorizes courts to put a victim of discrimination in the position that she or he would have been in but for the unlawful discrimination. That is exactly what the District Court did in this case.

In crafting a remedy under Title VII, a court must first, of course, identify the precise injury caused by the discrimination and then shape a remedy that will, as much as possible, erase that injury. *See Albemarle Paper*, 422 U.S. at 418, 95 S.Ct. at 2372 (" 'The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured.' ") (quoting *Wicker v. Hoppock*, 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867); original capitalization restored). In the context of this case, Judge Gesell's finding of liability rested upon his conclusion that Ms. Hopkins would have been made a Price Water-

---

7. Congress' broad remedial intentions are similarly reflected in the portion of the 1972 amendments vesting the Equal Employment Opportunity Commission ("EEOC") with administrative enforcement powers. The Senate report explaining that provision noted:

> It is the committee's view that this authority be broadly construed with the view toward completely rooting out and eliminating employment discrimination. The Commission is to take whatever affirmative steps are needed to provide a full and complete remedy to the aggrieved party or class and to obtain full and immediate compliance with the Civil Rights Act of 1964.

S.REP. No. 415, 92d Cong., 1st Sess. 21–22 (1971).

house partner in March 1983 were it not for the invidious influence of sex stereotyping in the firm's decisionmaking. Therefore, it is apparent that an invitation to join the Price Waterhouse partnership would be "the most complete relief possible" and in fact the *only* possible relief that would restore Ann Hopkins to "the situation [s]he would have occupied if the wrong had not been committed." *Id.* at 419 (quoting *Wicker,* 73 U.S. (6 Wall.) at 99).[8]

"The District Court's decision [in crafting a Title VII remedy] must ... be measured against the purposes which inform Title VII." *Albemarle Paper,* 422 U.S. at 417, 95 S.Ct. at 2371. Time and again, the Supreme Court has instructed that a complete remedy "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *See id.* at 421, 95 S.Ct. at 2373 (footnote omitted) (discussing back pay); *see also International Bhd. of Teamsters v. United States,* 431 U.S. 324, 365, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977) (seniority relief); *Franks,* 424 U.S. at 771, 96 S.Ct. at 1267 (seniority relief). In addition to those two pervading statutory purposes, we note that one of the specific congressional concerns animating the 1972 amendments to Title VII was the need to tear down discriminatory barriers in the top echelons of the job market that continued to prevent women and minorities from "ascend[ing] the higher rungs in professional and other life." *See* 118 CONG.

REC. 3802 (1972) (remarks of Sen. Javits); *see also* Bartholet, *Application of Title VII to Jobs in High Places,* 95 HARV.L.REV. 945, 980–83 (1982). We would directly subvert what Congress intended in the 1972 amendments if we were to hold that partnership could not be awarded to a person who was denied it because of unlawful discrimination.[9]

### 3. The Hishon Decision

As we have noted above, the Supreme Court in *Hishon* has already decided that Title VII does intrude into a partnership's admission decisions if it can be shown that a denial of partnership was based on prohibited discrimination. Indeed, the Supreme Court was unanimous in rejecting the view that "partnership" was beyond the reach of Title VII:

> Respondent contends that advancement to partnership may never qualify as a term, condition, or privilege of employment for purposes of Title VII. First, respondent asserts that elevation to partnership entails a change in status from an "employee" to an "employer." However, even if respondent is correct that a partnership invitation is not itself an offer of employment, Title VII would nonetheless apply and preclude discrimination on the basis of sex. The benefit a plaintiff is denied need not *be* employment to fall within Title VII's protection; it need only be a term, condition, or privilege *of* employment. It is also of no consequence that employment as an associate necessarily ends when an associate be-

---

8. Price Waterhouse is simply wrong when it asserts, rather inexplicably, that "ordering that an employee be transformed into a partner, rather than reinstated as an employee and reconsidered for partnership, 'catapult[s] [the employee] into a better position than [she] would have enjoyed in the absence of discrimination.'" Brief for Appellant at 31 (quoting *Ford Motor Co. v. EEOC,* 458 U.S. 219, 234, 102 S.Ct. 3057, 3067, 73 L.Ed.2d 721 (1982)). The District Court's finding of discrimination was based upon Price Waterhouse's decision to "hold" Hopkins' candidacy in March 1983 rather than make her partner, *i.e.,* it found that "in the absence of discrimination" Hopkins would have been made a partner in 1983. Thus, making her a partner now would *not* put her in a "better

position" than she would have been in absent the discrimination.

9. Monetary relief alone may be inadequate both as a deterrent and as a form of compensation. As Judge Gesell noted in the context of this case, even if monetary relief could be crafted with precision, it may nonetheless fall short of fully compensating Hopkins for the opportunity she was denied by Price Waterhouse. *See* 737 F.Supp. at 1211; *see also* Note, *Tenure and Partnership as Title VII Remedies,* 94 HARV.L.REV. 457, 465–66 (1980) (discussing inability of monetary damages to compensate for lost prestige and career continuity and its inadequacy in fully deterring "deep-pocket" defendants).

comes a partner. A benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship. Pension benefits, for example, qualify as terms, conditions, or privileges of employment even though they are received only after employment terminates. Accordingly, nothing in the change in status that advancement to partnership might entail means that partnership consideration falls outside the terms of the statute.

Second, respondent argues that Title VII categorically exempts partnership decisions from scrutiny. However, respondent points to nothing in the statute or the legislative history that would support such a *per se* exemption. When Congress wanted to grant an employer complete immunity, it expressly did so.

Third, respondent argues that application of Title VII in this case would infringe constitutional rights of expression or association. Although we have recognized that the activities of lawyers may make a "distinctive contribution ... to the ideas and beliefs of our society," respondent has not shown how its ability to fulfill such a function would be inhibited by a requirement that it consider petitioner for partnership on her merits. Moreover, as we have held in another context, "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." There is no constitutional right, for example, to discriminate in the selection of who may attend a private school or join a labor union.

467 U.S. at 77–78, 104 S.Ct. at 2234–35 (citations and footnotes omitted; emphasis in original).

In light of the Court's holdings in *Hishon,* the answer to the question whether Title VII will afford a complete remedy once it is found that admission to partnership has been denied due to prohibited discrimination seems self-evident. In fact, it would be impossible to reconcile a denial of this remedial authority with the Court's resounding affirmation in *Hishon* that Title VII promises employees *nondiscriminatory* consideration for partnership where consideration is held out as a privilege of employment. The mere fact that elevation to partnership may place the beneficiary beyond Title VII's protective reach [10] in no way proves that Title VII is powerless to elevate a victim of discrimination to that position in the first place. This is precisely the point that was made by Chief Justice Burger for a unanimous Court in *Hishon.*[11]

---

**10.** We note—without reaching the question ourselves—that some courts have held that partners are not "employees" under Title VII and that discrimination directed against partners is therefore beyond the reach of the statute. *See Wheeler v. Hurdman,* 825 F.2d 257 (10th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987); *EEOC v. Dowd & Dowd, Ltd.,* 736 F.2d 1177 (7th Cir.1984); *Burke v. Friedman,* 556 F.2d 867 (7th Cir.1977); *cf. Hyland v. New Haven Radiology Associates, P.C.,* 794 F.2d 793 (2d Cir.1986). We recognize, however, that a woman in Hopkins' position may find protection under the statute should she be admitted to the partnership on unequal terms or suffer retaliation upon becoming a partner based upon her previous assertion of Title VII rights. Under such conditions, the admission to partnership may amount to a subterfuge for discriminating against an employee and the victim of discrimination arguably would remain protected by the statute. *Cf. Hishon,* 467 U.S. at 79 n. 2, 104 S.Ct. at 2232 n. 2 (Powell, J., concurring) ("Of course, an employer may not evade the strictures of Title VII simply by labeling its employees as 'partners.' "); *Wheeler,* 825 F.2d at 261, 277 (holding partners are not "employees" under Title VII, but distinguishing the case where an employee might be made a partner as "a sham" to enable subsequent discrimination).

**11.** Furthermore, the remedial power of the National Labor Relations Act ("NLRA")—which the Supreme Court has consulted regularly in construing the reach of Title VII's section 706(g)—has been construed to include the power to elevate an unlawfully discharged worker to a position that is itself beyond the scope of the NLRA. In *Oil, Chemical and Atomic Workers Int'l Union v. NLRB,* 547 F.2d 575, 589 (D.C.Cir. 1976), *cert. denied sub nom. Angle v. NLRB,* 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977), this court held that, under the NLRA, "an employee who is illegally discharged and who, but for that discharge, would have been promoted to a supervisory position" must be "reinstated to [that] supervisory position," even though the NLRA does not itself protect supervisory employees. *See also Golden State Bottling Co. v.*

It is, of course, true, as Justice Powell noted in his concurrence to *Hishon,* that a partnership *relationship* is "markedly" different from the relationship of an employer and employee. *See* 467 U.S. at 79, 104 S.Ct. at 2235 (Powell, J., concurring). But this consideration is not controlling in this case. The instant case involves only an employee's elevation to partnership; it does not involve Ms. Hopkins' retention of partnership or the regulation of the relationship among partners at Price Waterhouse. Thus, we are not confronted by the concerns expressed in Justice Powell's concurring opinion. Justice Powell emphasized that the Court in *Hishon* did not reach the question whether Title VII protects employees *after they become partners;* nor do we reach that question in this case.

#### 4. *The EEOC's Position*

It is also noteworthy that the EEOC, the agency to which we owe deference in construing Title VII, *see EEOC v. Commercial Office Prods. Co.,* 486 U.S. 107, 115, 108 S.Ct. 1666, 1671, 100 L.Ed.2d 96 (1988), agrees with our construction of the remedial reach of Title VII. This is significant because Congress has recognized "the importance of administrative expertise relating to the resolution of problems of employment discrimination." S.Rep. No. 415, 92d Cong., 1st Sess. 18 (1971). In explaining Congress' decision to grant the EEOC administrative enforcement powers, the Senate Committee on Labor and Public Welfare observed that "[m]any of the Title VII proceedings involve complex labor relations and business operations issues *particularly in the fashioning of the remedies for eliminating discrimination.* The Equal Employment Opportunity Commission would be expected to develop an important reservoir of expertise in these matters, expertise which would not readily be available to a widespread court system." *Id.* at 18–19 (emphasis added).

*NLRB,* 414 U.S. 168, 187–89, 94 S.Ct. 414, 426–27, 38 L.Ed.2d 388 (1973) (illegally discharged employee who would have been made an independent contractor but for the discharge may be reinstated as an independent contractor under the NLRA, even though that status would take

The EEOC has applied its expertise to the question before us and has concluded that Title VII authorizes court-ordered elevation to partnership as a remedy for the discriminatory denial of partnership. *See* Brief of the Equal Employment Opportunity Commission as *Amicus Curiae* at 18–23. The EEOC's view reinforces our own independent reading of the statute. *See Lander,* 888 F.2d at 157 (taking note of EEOC position in construing remedial reach of Title VII).

#### 5. *Conclusion on Partnership as a Remedy Under Title VII*

All of the foregoing considerations lead us to conclude that the ordering of a partnership is consonant with the broad remedial goals of Title VII and with " '[t]he general rule ... that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury.' " *Albemarle Paper,* 422 U.S. at 418, 95 S.Ct. at 2372 (quoting *Wicker v. Hoppock,* 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867)).

### D. *Constitutional, Contractual and Equitable Considerations*

Although all signposts in the statute, its legislative history and the case law point strongly toward affirming the District Court's judgment to order partnership, thereby vindicating "[t]he 'make whole' purpose of Title VII," *id.* at 419, Price Waterhouse urges that there are several countervailing considerations weighing against this conclusion. We consider them in turn.

#### 1. *Freedom of Association*

■ Price Waterhouse argues that a court order forcing it to accept Ann Hopkins as a partner would violate its partners' constitutional rights of free association. This argument is entirely unpersuasive. Even assuming *arguendo* that a large busi-

employee outside the Act's protections). Thus, the mere fact that Title VII might not regulate relationships *among* partners does not refute the statute's power to elevate an employee *to* partnership as a remedy for a clear statutory violation.

ness partnership such as Price Waterhouse has cognizable associational rights, they must yield to the compelling national interest in eradicating discrimination. *See, e.g., New York State Club Ass'n v. City of New York,* 487 U.S. 1, 12–13, 108 S.Ct. 2225, 2233–34, 101 L.Ed.2d 1 (1988); *Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 549, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987) ("Even if [the forced admission of women members] does work some slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women."); *Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984); *Runyon v. McCrary,* 427 U.S. 160, 175–76, 96 S.Ct. 2586, 2596–97, 49 L.Ed.2d 415 (1976).

It is difficult to differentiate between the constitutional argument Price Waterhouse advances here and the one rejected in a nearly identical setting in *Hishon.* There, King & Spalding, a large law partnership, had similarly insisted that "application of Title VII in [its] case would infringe constitutional rights of expression or association." 467 U.S. at 78, 104 S.Ct. at 2235. The Supreme Court brushed aside the argument, noting that " '[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections.' " *Id.* (quoting *Norwood v. Harrison,* 413 U.S. 455, 470, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973)).

On the basis of the foregoing authorities, we reject Price Waterhouse's suggestion that its claimed freedom of association precludes the court from ordering partnership as a Title VII remedy.

### 2. *Principles of Contract Law*

■ Price Waterhouse also points out that courts have traditionally been reluctant to order the creation of a partnership as an equitable remedy for breach of contract, and urges that this contract principle be carried over into the realm of antidiscrimination law. It is true that in common law contract cases the courts have hesitated to compel persons to work together or to enforce other ongoing human relationships, including partnerships. But this contract principle is not grounded in the peculiar nature of partnerships but rather extends to all "personal service" contracts, *see Infusaid Corp. v. Intermedics Infusaid, Inc.,* 739 F.2d 661, 668 (1st Cir.1984), including simple employment relationships. Thus, citing the same principle, courts have refused to order employers to reinstate employees as a remedy for the breach of an employment contract. *See, e.g., Zannis v. Lake Shore Radiologists, Ltd.,* 73 Ill. App.3d 901, 29 Ill.Dec. 569, 571–72, 392 N.E.2d 126, 128–29 (1979); *Fitzpatrick v. Michael,* 177 Md. 248, 254–56, 9 A.2d 639, 641–42 (1939); *Sprunt v. Members of the Bd. of Trustees of the Univ. of Tenn.,* 223 Tenn. 210, 443 S.W.2d 464, 466 (1969).

Title VII makes expressly clear, however, that this common law rule does not limit a court's power to fashion equitable remedies for employment discrimination in violation of the statute. Price Waterhouse concedes, as it must, that the "plain language" of Title VII contemplates judicial authority to order reinstatement and hiring of employees. *See* 42 U.S.C. § 2000e–5(g) (1988). Thus, even under appellant's analysis, it is plain that there is no merit to the argument that common law principles of contract law serve to limit Title VII's remedial reach.[12]

---

**12.** Moreover, even in the context of traditional contract law, "[t]here is a substantial body of authority that endorses specific performance when breach by the employer would undermine an important public interest. Specific performance may be ordered to remedy civil-rights violations. . . ." E. YORIO, CONTRACT ENFORCEMENT: SPECIFIC PERFORMANCE AND INJUNCTIONS § 14.4.1.3, at 381 (1989). Commentators have also suggested that the rising availability of reinstatement under statutory schemes such as Title VII has led to an erosion of the traditional contract rule upon which Price Waterhouse relies. *See* J. CALAMARI & J. PERILLO, CONTRACTS § 16–5, at 667–68 (3d ed. 1987) ("In view of these developments, the reasons behind the traditional bar against a court decree ordering an employer to perform are questionable.") (footnote omitted).

### 3. The Equities of this Case

█ Lastly, Price Waterhouse argues that even if the District Court was empowered under Title VII to order partnership as a remedy, it was an abuse of discretion for the court to do so on the facts of this case. Specifically, appellant argues that Ms. Hopkins' own alleged misconduct [13] following the March 1983 decision to defer her candidacy made her eventual elevation to partnership impossible and precludes the court from now making Ms. Hopkins a partner. We do not agree.

The misconduct to which Price Waterhouse refers occurred only after Price Waterhouse's own illegal sex discrimination had intervened to deny Ms. Hopkins her place in the partnership. Given the findings of sex discrimination committed by appellant's partners, there is a certain hint of irony in the moral indignation with which Price Waterhouse protests the prospect of having to offer partnership to a person who allegedly misstated the substance of a conversation. We also note that Price Waterhouse does *not* claim that, if Ms. Hopkins had been admitted to partnership in March 1983, her subsequent alleged misconduct would have justified her dismissal from partnership.

Yet, with these observations aside, we find that the District Court expressly considered Ms. Hopkins' alleged misconduct in the shaping of its equitable remedy, deducting from her back pay award any "claim for the fiscal year 1983–1984." 737 F.Supp. at 1213. We review this judgment under the highly deferential abuse-of-discretion standard, see *Albemarle Paper*, 422 U.S. at 424, 95 S.Ct. at 2375, and, on the record before us, we can find no basis to overturn the trial court's decision. For us to reject the District Court's judgment on this issue would be a flagrant disregard of the obvious limits of the abuse-of-discretion standard.

Judge Gesell not only limited back pay, he was careful to consider whether there existed too much hostility between the parties to permit an effective working relationship; he found there did not. *See* 737 F.Supp. at 1210. He also considered alternative remedies, such as front pay, and concluded that it would be impossible to tailor a prospective remedy so that Ms. Hopkins truly would be made whole. *Id.* at 1211. Finally, he considered and rejected Price Waterhouse's contention that Ms. Hopkins is entitled only to reconsideration for partnership by Price Waterhouse, finding that ordering reconsideration in this case would be "futile and unjust." *Id.* at 1210–11; *see also id.* at 1209 n. 9. We find no abuse of discretion by Judge Gesell in ordering a partnership based on the facts of the case before him.

### E. Calculation of Back Pay

█ Finally, we find no error or abuse of discretion in the District Court's calculation of Ms. Hopkins' back pay award. In particular, we find that Judge Gesell properly accounted for Ms. Hopkins' inadequate mitigation in formulating the award.

The mitigation requirement of Title VII provides that "[i]nterim earnings *or amounts earnable with reasonable diligence* by the person or persons discriminated against shall operate to *reduce* the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g) (1988) (emphasis added). This is precisely the formula Judge Gesell applied: he first found that Ms. Hopkins' maximum earning potential following her departure from Price Waterhouse—*i.e.,* the "amount[ ] earnable with reasonable diligence" in her case—was $100,000 per year, and he then reduced her back pay award by that amount. 737 F.Supp. at 1215.

The fact that courts have sometimes denied back pay altogether to Title VII plaintiffs who could have found work but de-

---

**13.** The District Court found that Ms. Hopkins had "misstated the substance of a meeting ... between herself and Joseph E. Connor, the Chairman and Senior Partner of Price Waterhouse, regarding her partnership prospects. Ms. Hopkins misleadingly implied that Mr. Con-

nor had disparaged certain partners who opposed her candidacy and that he had warned of the adverse consequences his partners might experience for opposing her the next year." 737 F.Supp. at 1213.

clined to do so, *see, e.g., Sangster v. United Air Lines, Inc.,* 633 F.2d 864, 868 (9th Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981), is irrelevant. Judge Gesell found that Ms. Hopkins could *not* have found a job with pay equal to what she would have earned as a Price Waterhouse partner. *See* 737 F.Supp. at 1215. That fact distinguishes her case from others where plaintiffs failed to seek jobs that would have compensated them completely for their losses and elected instead to remain unemployed. *See, e.g., Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (plaintiffs forfeited back pay after refusing employer's unconditional offer to reinstate them to the jobs from which they had been fired); *Ford v. Nicks,* 866 F.2d 865, 874 (6th Cir.1989) (plaintiff forfeited claim to back pay after refusing job that "paid slightly more" than job she was discriminatorily denied); *cf. Donnelly v. Yellow Freight System, Inc.,* 874 F.2d 402, 411 (7th Cir.1989) (to cut off back pay liability, the employer must show "that with the exercise of reasonable diligence there was a reasonable chance the employee might have found comparable employment, *the earnings of which would offset any damages awarded* ") (emphasis added), *aff'd,* —— U.S. ——, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990). While it is true that the trial judge found that Ms. Hopkins could have earned more than she did upon leaving

Price Waterhouse, he properly took that fact into account by reducing her back pay award by the "amount[ ] earnable with reasonable diligence." *See Ensor v. Painter,* 661 F.Supp. 21, 24 (E.D.Tenn.1987) ("[T]he Court finds that plaintiff Ensor has maintained a lower salary at her subsequent employment for nearly two years without evidence of having sought a higher-salaried position. Therefore, the Court finds that . . . her award of back pay should be adjusted accordingly."). On this record, we can find no reason to disturb the District Court's calculation of back pay.

## III. CONCLUSION

For all of the foregoing reasons, the judgment of the District Court is affirmed.

*So ordered.*

HENDERSON, Circuit Judge, concurring:

I concur in the majority's decision but only because the narrow scope of our review compels affirmance. The district court found as a fact that the decision to defer consideration of Hopkins's partnership candidacy was a product of intentional discrimination. While I view that finding as highly questionable, in light of the all but overwhelming evidence that the decision resulted from Hopkins's own, well-attested personality deficiencies,[1] I cannot say it is "based on an utterly implausible

---

1. Hopkins's difficulty in working with other employees is clearly established in the record and was repeatedly cited in the written assessments of Price Waterhouse partners as the reason for voting against partnership. *See* J.A. 37–45. As the district court expressly found:

    During the review of Ms. Hopkins' candidacy by the Admissions Committee it was apparent that, although there was considerable respect for her abilities and record of achievement and a recognition of the benefits she had brought to the firm, she ranked very low on her personal interrelations. Even some partners who were most familiar with her work and were strongly urging the Committee and Board to recommend her for partnership in the interests of the firm commented pointedly on her inability to get along with staff and partners.

737 F.Supp. at 1205. Illustrative of Hopkins's treatment of those with whom she worked are the following incidents: (1) during a telephone

conversation with a fellow employee, Hopkins "screamed obscenities to him, four letter words, continuous stream of them for up to 45 minutes," J.A. 76; (2) during a lunch with the chief partner in her section and another partner, she volunteered a lengthy and "vitriolic" critique of her co-workers, "going through the entire professional staff in our office and giving us a read-out on the difficulties that the people exposed or she had experienced with them or that she viewed them," J.A. 80; (3) while viewing materials produced by an outside graphics contractor who had contracted with Price Waterhouse for years, Hopkins so criticized his work, "express[ing] herself fairly directly," that he afterward called a senior manager fearful he was going to lose the Price Waterhouse account, J.A. 141; and (4) at the top of a flow chart she received, Hopkins, gratuitously it appears, wrote a personal, and obscene, remark about a fellow employee, J.A. 140.

account of the evidence" so as to warrant reversal of the district court's decision. *See Bishopp v. District of Columbia*, 788 F.2d 781, 785–86 (1986); *see also Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as trier of fact, it would have weighed the evidence differently."). For this reason, I am constrained to concur in affirming the district court's conclusion on liability.

I also concur, but even more reluctantly, in affirming the award of a partnership interest under the circumstances here. While I agree with the majority that the plain language of section 706(g) of title VII, together with its legislative history and interpreting case law, make it clear that partnership is a permissible remedy under title VII, I am convinced that this extraordinary equitable remedy should be dispensed only under limited circumstances when justice so dictates. Partnership is a relationship requiring trust and cooperation among the individual partners. As Justice Powell observed in *Hishon*, this relationship "differs markedly from that between employer and employee," the former "contemplat[ing] that decisions important to the partnership normally will be made by common agreement ... or consent among the partners." 467 U.S. at 79–80, 104 S.Ct. at 2236 (Powell, J., concurring);[2] *see also Wheeler v. Main Hurdman*, 825 F.2d 257,

273 (10th Cir.) (partnerships "embody very special relationships and sensitive management concerns *inter se*"), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987). Further, the partnership relationship imposes on each partner mutual liability for the misconduct of each other partner. *See* J. Crane & A. Bromberg, *Law of Partnership* § 58 (1968). For these reasons, courts should exercise great caution in awarding the remedy of partnership to avoid excessive intrusion on or disruption of the often delicate partnership relationship. In my view, Hopkins's conduct toward other employees and partners both before[3] and, particularly, after her candidacy deferment[4] casts great doubt on her ability to function effectively with the other Price Waterhouse partners. Nevertheless, I cannot say that under these circumstances the district court abused its discretion in awarding Hopkins a partnership interest.

As the district court noted, Price Waterhouse, which has over 900 partners in approximately 90 locations throughout the country, "lacks the intimacy and interdependence of smaller partnerships." 737 F.Supp. at 1210. For that reason, it is far less likely than many smaller and more cohesive partnerships to suffer serious disruption if forced to accept a partner of Hopkins's disposition. Further, assuming, as we must in light of the district court's factual findings, that Hopkins was the victim of gender discrimination, she is entitled to compensation of some sort and the available remedies are limited. While I am

---

**2.** Justice Powell was speaking of law partnerships in particular but his reasoning applies equally to an accounting partnership.

**3.** *See supra* note 1.

**4.** The district court made an express finding that during the year following deferment of her partnership candidacy Hopkins engaged in "unreasonable intentional conduct" by substantially misrepresenting to Donald Epelbaum, a partner in her section, a conversation she had with the chairman and senior partner, Joseph E. Connor. 737 F.Supp. at 1212–13. Relying on "strong" evidence in the record, the district court found that Hopkins "misstated" the substance of her conversation with Connor and "misleadingly implied that Mr. Connor had disparaged certain

partners who opposed her candidacy and that he had warned of adverse consequences his partners might experience by opposing her candidacy." 737 F.Supp. at 1213. Because of that incident, Epelbaum withdrew his previously strong support of Hopkins's partnership candidacy. Nor was that the first time Hopkins acted with something less than full candor to partners in the firm. In 1980, she represented to another partner that a project had been completed "within budget" when, in fact, there was a $35,000 discrepancy which she acknowledged only after persistent questioning. J.A. 40. In light of the facts in the record, I, unlike the majority, find no irony in Price Waterhouse's reluctance to accept as partner an individual whose history so strongly suggests she cannot be trusted.

loath to reward Hopkins's conduct with an award of partnership, the alternative remedy of unrestricted front pay is even less satisfactory and, as the district court observed, with considerable restraint, "might well provide a wholly unwarranted windfall." 737 F.Supp. at 1211.

Based on the entire record, I am doubtful that the judgment of the district court achieves justice. Nevertheless, because my skepticism falls somewhat short of "a definite and firm conviction that a mistake has been committed,"[5] I am required to concur in the majority's affirmance of that judgment.

---

**5.** *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (A finding of the trial court may be reversed as clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").