**Valerie THOMAS, Julie Taylor–Bland, and Rita E.H. Raymond, Plaintiffs,**

v.

**NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, Defendant.**

**Civil Action No. 91–3332(JR).**

United States District Court, D. Columbia.

July 24, 1996.

David L. Rose, Washington, DC, for Plaintiffs.

Joseph A. Yablonski, Yablonski, Both & Edelman, Washington, DC, for Defendant.

## MEMORANDUM

ROBERTSON, District Judge.

Plaintiffs, all former employees of defendant National Football League Players Association (NFLPA), complain that NFLPA's lay-off and discharge of plaintiffs Valerie Thomas and Rita Raymond and alleged constructive discharge of plaintiff Julie Taylor–Bland were in retaliation for plaintiffs' opposition to discriminatory employment practices in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e et seq.

The case was tried by the Court sitting without a jury. At trial, for reasons set forth in the record, Count IV of the complaint, which alleged a discriminatory refusal to comply with an arbitration award, was dismissed, and NFLPA was granted judgment as a matter of law on Count I, which alleged a pattern and practice of discrimination in promotions. Count II of the complaint, which alleges the retaliatory lay-off of Thomas and Raymond, and Count III, which alleges the retaliatory discharge or constructive discharge of each plaintiff, are decided below.

*Facts*

The following facts were established at trial:

1. Plaintiffs Thomas, Raymond and Bland were all employees of NFLPA in the collective bargaining unit of the Office and Professional Employees International Union (OPEIU) represented by the union's Local 2. Each of the plaintiffs is a black woman. Each was a Local 2 shop steward while at NFLPA. Thomas joined NFLPA as a secretary in July 1983. She was promoted to the position of research analyst in the licensing department in June 1994. Raymond joined NFLPA on a part-time basis in April 1983. She was given full-time work as a receptionist in August 1984 and promoted to legal secretary in 1985. Bland began work in February 1982 as a settlement clerk in the benefits department. She was promoted to secretary to the executive director in May 1985.

2. Bland filed a grievance with Local 2 in May 1984 alleging race discrimination after she was denied a secretarial position. Thomas filed a charge with the Equal Employment Opportunity Commission in July 1987 alleging race and sex discrimination in pay and promotions. Sometime in 1987, Rita Raymond complained to Local 2 representatives, at least informally, that she had been denied a position as a temporary secretary.

3. In 1987 there was a players' strike in the National Football League. The failure of the NFLPA and the NFL to agree upon a continuation of their collective bargaining agreement had the effect of cancelling the players' union dues check-off. Cancellation of the dues check-off drastically reduced the revenues of NFLPA and created a financial crisis within the organization.

4. The NFLPA board met during the first week of March 1988. At that meeting, George Martin was elected president, and Mike Davis was elected vice-president of the union. Also at that meeting, Gene Upshaw, NFLPA's executive director, proposed a budget designed to cope with NFLPA's decreased revenues. Upshaw's proposal con-

templated reducing personnel costs through attrition rather than lay-offs.

5. Upshaw's budget was rejected. NFLPA's executive committee instead demanded an immediate across the board reduction in personnel costs of ten percent. Upshaw relayed that direction to NFLPA's controller, Bill Garner, but changed the amount of the required reduction to eleven percent.

6. After a banquet occasioned by the board meeting, a number of people gathered in Martin's hotel room, at Martin's suggestion. In attendance were Martin, executive committee member Bubba Paris and his wife, plaintiff Thomas and her husband, plaintiff Bland and her husband, and Sharon Ravarra, a secretary employed in NFLPA's west coast office. At that meeting, Thomas and others expressed concerns about, among other things, promotional opportunities for blacks and women in the OPEIU collective bargaining unit and unresolved Local 2 grievances.

7. Martin convened a second meeting with staff sometime after March 10, 1988. In attendance were Martin, Thomas, Bland and her husband, and Cheryl Davis, another bargaining unit employee, and her husband. Again, concerns about opportunities for blacks and women at NFLPA were aired. In response to a question from Martin, someone said that Upshaw was a racist. An organization chart of the NFLPA staff was used to point out the asserted lack of mobility of women and minorities at the union.

8. Martin, along with Mike Davis, also conducted a series of interviews and telephone calls with staff members in the two weeks that followed the board meeting. These interviews were conducted with assurances of confidentiality, and the interviewees, at least Thomas and Bland, spoke freely. Thomas was interviewed by, and had phone conversations with, both Martin and Davis. The subject matter of her conversations with Martin and Davis was wide ranging, but included discussion of race and sex discrimination at NFLPA in addition to other alleged misconduct. Davis also interviewed Raymond.

9. On March 18, 1996, Thomas, Raymond and four other employees—Sharon Ravarra, Linda Harris, Beverly Davis and Robyn King—were laid off. The decision to make the lay-offs, and the selection of the six employees, was Upshaw's.

10. Before deciding whom to lay off on March 18, Upshaw spoke with Martin and Davis. Davis told Upshaw, based on his interviews with Thomas and Raymond, that he had "heard some things that he thought were very disturbing." Martin told Upshaw that he had held meetings with staff and that problems with opportunities for promotion were discussed. Upshaw had suspicions that the employees he ultimately decided to lay-off were trying to undercut him but believed he did not have enough evidence.

11. After being informed of the lay-off that day, Thomas returned to her office to discover two men changing the locks on her office door and shutting down her computer.

12. Between the March board meeting and April 12, 1988 (but not necessarily before the March 18 lay-offs), the following events occurred: (1) Martin conducted an investigation into allegations of misconduct and mismanagement at NFLPA; (2) Martin asked Upshaw about how Upshaw was handling the issue of minority promotions; (3) Martin told Upshaw that Thomas had called Upshaw a racist, had complained about promotional opportunities for blacks and women in the collective bargaining unit, and had given him a four-page memorandum describing various employee grievances; (4) both Martin and Davis passed along the four-page memorandum to Upshaw; (5) Davis told Upshaw about his interviews and telephone conversations with Thomas and Raymond; and (6) Davis told Upshaw that Raymond had mailed him a copy of the same four-page memorandum.

13. On March 23, 1988, Davis gave Upshaw tape recordings of his telephone conversations with Thomas and Raymond. Upshaw testified that he heard Thomas say on the tapes the following with respect to NFLPA staff: (1) that Donna Jarvis was a dingbat; (2) that Dee Rauch was a racist; (3) that Frank Woschitz was also a racist; (4) that Pat Leon was a bitch; (5) that Clark

Gains was incompetent and had a brain tumor; (6) that Miki Yaras was a drunk; (7) that Doug Allen, assistant to Upshaw, was a power monger and ran roughshod over everyone; and (8) that Upshaw was being used by Doug Allen and was an embarrassment to the labor movement. Upshaw testified that he heard Raymond say: (1) that Bill Garner, the controller, kept two sets of books; (2) that Clark Gains was incompetent; and (3) that Donna Jarvis was incompetent and had no business being at NFLPA. Upshaw testified that he heard Raymond say that she would send Davis a copy of the memorandum she called "what every player should know" about NFLPA.

14. Upshaw believed Thomas and Raymond were responsible for the four-page memorandum. The memorandum makes many allegations, including: (1) that a secretary with five years seniority at NFLPA was told she was unqualified for a position in the licensing department even though the director of that department "learned licensing on the job" and that the position was then filled by an outside law school graduate; (2) that two secretaries were denied jobs in the accounting department because they "had no CPA" even though the controller was not a CPA either; (3) that promotions are a "rare thing" at NFLPA; (4) that a paralegal assistant was hired from outside who did not have a paralegal degree despite applications from two in-house secretaries; (5) that Valerie Thomas was paid $20,000 less than her boss, Michael Duberstein, even though they performed the same work; (6) that "assessments for money and job classifications are subjective and not according to duties and responsibilities"; (7) that "because Valerie Thomas has been our shop steward for our concerns and negotiations of our contract, her opportunities have been lessened and in some cases denied"; and (8) that a mail clerk, Mark Levin, will be allowed to attend certain meetings in California but Thomas will not, despite her greater expertise in contract negotiations and greater tenure at NFLPA.

15. On April 12, 1996, Upshaw terminated for cause all the employees he had laid-off on March 18, except Robyn King. Letters sent by Upshaw to each terminated employee that date stated in relevant part:

It has come to my attention that during your employment, you made libelous and slanderous statements concerning NFLPA's executive personnel, violated the confidentiality and trust required of you, were disloyal to NFLPA, and engaged in other acts which were intended to undermine NFLPA's effectiveness in serving the interests of its members. Your conduct was intended to publicly embarrass and harm the image of NFLPA and theatened [sic] the integrity of this organization.

16. Upshaw testified that he made the decision to terminate Thomas because of what he believed she had said and written about NFLPA and its employees. His "evidence" was conversations he had had with Davis and Martin about their meetings and telephone conversations with Thomas, Thomas' taped-recorded comments, and the four-page memorandum. Upshaw also believed that Thomas had participated in an effort at the March board meeting to have NFLPA's player representatives remove him from his position as executive director, and he believed that she had provided damaging information about NFLPA to the news media.

17. Upshaw testified that he made the decision to terminate Rita Raymond based on his conversations with Davis, Raymond's tape-recorded comments, and his belief that she, too, was responsible for the four-page memorandum.

18. Plaintiff Bland was not laid off or terminated. She remained at NFLPA until she resigned, effective June 13, 1988.

19. Between the March meetings with Martin and May 20, 1988, the date Bland tendered her resignation, Bland testified that the following events occurred: (1) she was excluded from an NFLPA board meeting at which player representatives were considering the proposed budget and staff cuts; (2) she was instructed not to open Upshaw's mail even though this had been one of her duties in the past; (3) she was denied a day's leave on March 21; (4) Bill Garner screamed at her for wasting Odelia Isaacs' time; (5) she was directed to stuff 200–300 envelopes just before a meeting of the collective bar-

gaining unit; (6) she was called a "liar" by Pat Takach; (7) she was asked to pay back $140 that she allegedly owed to NFLPA; and (8) when she inquired of Upshaw whether she should apply for a promotion to a secretarial position in NFLPA's legal department, Upshaw said that "he did not see her in that position."

## Liability

■ Title VII makes it unlawful to discharge or otherwise discriminate against an employee because she "has opposed any practice made an unlawful practice" by the Act. 42 U.S.C. § 2000e–3(a). To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity, (2) she was subjected to an adverse action by her employer, and (3) there was a causal link between the adverse action and the protected activity. *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985).

■ If a *prima facie* case is established, the finder of fact may infer a retaliatory purpose from the fact that the employer had knowledge of the employee's protected activity and that the adverse personnel action took place after that activity. *Id.* The employer may rebut that inference by showing that it would have taken the same action for other, non-discriminatory reasons. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989). The burden of proof shifts to the employer to make that showing, however, and a court should hold against the employer if it is unable to separate the permissible and the impermissible motivations for an employer's conduct. *Hopkins v. Price Waterhouse,* 920 F.2d 967, 972–74 (D.C.Cir.1990).

### 1. Thomas

■ In the two weeks prior to her lay-off on March 18, 1988, Thomas met with NFLPA president Martin on two occasions and complained about the lack of promotional opportunities for blacks and women in the collective bargaining unit. These meetings were followed by interviews and telephone calls with Martin. Thomas also discussed these issues with NFLPA vice-president Davis. In these meetings, interviews and telephone calls, Thomas expressed concerns about the promotional opportunities of blacks and women at NFLPA. Those expressions were protected activities within the meaning of Title VII. Thomas also gave Martin a four-page memorandum that outlined numerous complaints about NFLPA's management of its Local 2 employees. The memorandum does not expressly charge race and sex discrimination, but in the context of the activities in which Thomas was engaged at the time, Thomas's distribution of the memo to Martin was protected activity. I find that Thomas was laid off and then discharged immediately following these protected activities and that she established a *prima facie* case of retaliation.

To rebut that *prima facie* case, NFLPA established that it had to lay-off clerical staff because of its financial crisis. The employees selected for lay-off were not selected based on their seniority, however. And the security measures that attended Thomas' lay-off—never explained at trial—were more consistent with retaliation than with neutral, financially driven lay-offs. Moreover, Thomas's discharge, on April 12, 1988, came after Upshaw learned the substance of Davis's conversations with Thomas and listened to tape-recordings of some of those conversations. Martin told Upshaw about his conversations with Thomas on the subject of promotional opportunities, including her purported accusation that Upshaw was a racist, before Thomas's discharge. Upshaw also had a copy of the memorandum critical of NFLPA's employment practices, for which he believed Thomas was responsible. I infer from all of this evidence that the selection of Thomas to be laid off and her subsequent discharge were motivated, in substantial measure, by NFLPA management's disapproval of her criticism of NFLPA's employment practices, which was protected activity.

Thomas certainly did not limit her criticisms of NFLPA management to its asserted failure to advance the careers of blacks and women, and there were elements of her behavior that might well have warranted discharge. But it was NFLPA's burden to demonstrate that Thomas would have been discharged regardless of her protected activity, and NFLPA failed to sustain that burden.

I cannot, on this record, separate the permissible from the impermissible motivations which lay behind NFLPA's decision to lay-off and then discharge Valerie Thomas. I conclude, accordingly, that NFLPA retaliated against Thomas in violation of Title VII.

### 2. Raymond

■ Raymond failed to make out a *prima facie* case of retaliation. The evidence does not establish that she engaged in protected activity that had any connection to her subsequent lay-off and discharge. She did not participate in the meetings with Martin during which promotional opportunities of NFLPA employees was discussed. With the exception of a few impolitic remarks recounted by Upshaw from his recollection of an unauthenticated tape-recording, the substance of her conversations with Davis is unknown. Those remarks, in any event, did not concern employment discrimination. There is a suggestion in the record that Raymond distributed the four-page memorandum critical of NFLPA, but that suggestion is created only by hearsay, and Raymond did not appear at trial to testify. While Thomas and Bland, who did testify, made vague references to a complaint Raymond made to Local 2 representatives sometime in 1987, I can find no connection between that complaint and Raymond's lay-off and discharge in March and April of 1988.

### 3. Bland

■ Bland was not laid off. She tendered her resignation on May 20, 1988, some six weeks after the layoff and discharge of her co-plaintiffs. The nexus between her participation in the two meetings with Martin in early March and the series of incidents that she testified transpired in the two months that followed is tenuous at best. In order to support a finding of retaliatory constructive discharge the record must establish not only the plaintiff's exercise of protected activity, but also "aggravating factors" that made the employee's work so intolerable that she was driven to quit. *See Dashnaw v. Pena*, 12 F.3d 1112 (D.C.Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994); *Katradis v. Dave–El of Washington,*

*D.C.*, 846 F.2d 1482 (D.C.Cir.1988). Bland has failed to prove such "aggravating factors" and has thus failed to establish that she was constructively discharged.

■ Several of the incidents of which Bland complains—exclusion from the Board meeting, denial of a day's leave, the direction not to open Upshaw's mail—occurred nearly two months before Bland submitted her resignation. The isolated comments of Takach and Garner, if made at all, were unprofessional but not, on their face, related to Bland's participation in protected activity. As for NFLPA's demand that Bland repay $140, the evidence established that Bland did, in fact, owe the money. Upshaw's comment that he did not see Bland in a particular secretarial job appears benign: Upshaw testified without contradiction that he knew Takach was leaving NFLPA and that he was considering Bland for Takach's job. Bland's working conditions may not have been ideal—office morale was suffering as a result of the March lay-offs—but they did not amount to such "intolerable" conditions that a reasonable person in Bland's position would have felt compelled to quit.

## Equitable Relief

### 1. Back Pay

Plaintiff Thomas is entitled to back pay from the date of her lay-off, March 18, 1988. Dr. Wertheimer's testimony and report established the value at the time of trial of the salary Thomas would have received at NFLPA but for her lay-off and discharge, and the amounts Thomas earned from other employment after leaving NFLPA. I find it too speculative to conclude that Thomas would have been promoted to a management position had she remained at NFLPA. I am also persuaded by the report of defendant's expert, Dr. Staller, that Dr. Wertheimer's estimate of the value of NFLPA's fringe benefits package is overstated. Based on Dr. Staller's analysis of non-working time benefits, legally required benefits and retiree benefits, Dr. Wertheimer's fringe benefit estimates will be reduced by 50 percent.

■ NFLPA claimed at trial, and had the burden of proving, that Thomas failed to

make reasonable efforts to mitigate damages.[1] Thomas held no permanent employment between March 18, 1988 and June 1995. After her unemployment benefits expired in 1988, she obtained work sporadically through referrals from temporary employment agencies. Thomas also looked for work by responding to newspaper advertisements and announcements of vacancies by public employers. In 1988, she inquired about, or submitted applications for, 22 jobs. In 1989, Thomas made 34 job inquiries. Nearly all the jobs she pursued had salaries well in excess of the pay she earned at NFLPA. In total, Thomas attended only five job interviews. In 1992, Thomas had a child and withdrew from the labor market

According to NFLPA's expert, Dr. Bloch, it should have taken Thomas about three months to find employment comparable to her job at NFLPA. This estimate was based on job availability in the Washington area and the average length of time workers similar to Thomas spent looking for work before landing a job, but Dr. Bloch did not rely on data that distinguished job-seekers who were terminated for cause from those whose previous employment had ended for other reasons. Dr. Bloch also estimated that virtually all job-seekers in Thomas's position who genuinely sought work would be employed within one to two years of leaving a previous job.[2]

Dr. Wertheimer's testimony did not include an estimate of when Thomas should have been expected to find employment. His opinion was that Thomas's negligible post-lay-off earnings of $120 in 1988 were reasonable, given the "career scarring" of her termination for cause, and that Thomas's efforts to obtain employment between 1989 and 1991 were also reasonable.[3]

After reviewing the record with due regard for a district court's duty to "fashion [equitable] relief so as to provide a victim of employment discrimination the most complete make-whole relief possible," *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C.Cir.1995), I find that NFLPA sustained its burden of establishing that Thomas's job-seeking activity following her discharge fell short of the exercise of "reasonable diligence" that Title VII requires and that her award of back-pay must be limited accordingly. Based on the expert testimony and reports of Dr. Bloch and Dr. Wertheimer, and giving due regard to the effects of "career scarring," I conclude that Thomas should have been able to find employment that was substantially equivalent in terms of responsibilities, salary and benefits by year's end 1989. Accordingly, the award of back pay to Thomas will be limited to the period from her lay-off to December 1989.

■ Based on Dr. Wertheimer's calculations, modified in accordance with Dr. Staller's analysis of fringe benefits, I find that $70,840 approximates the value at the time of trial of the salary and benefits that Thomas would have earned between March 1988 and December 1989, net of amounts she actually earned during the period. Unemployment benefits received by Thomas after her lay-off will not be deducted from the award. *See Maxfield v. Sinclair International*, 766 F.2d 788 (3d Cir.1985); *Brown v. A.J. Gerrard Mfg. Co.*, 715 F.2d 1549 (11th Cir.1983) (en banc).

### 2. Reinstatement

■ Reinstatement is inappropriate where the relationship between the parties is so hostile that there is no reason to believe that they would enjoy a productive and amiable working relationship. *See, e.g., Robinson v. SEPTA*, 982 F.2d 892, 899 (3d Cir.1993); *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111, 118 (7th Cir.1986). The reasons

---

1. Under Title VII, "[i]nterim earnings or the amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. 2000e–5(g); *Hopkins v. Price Waterhouse*, 920 F.2d 967, 981 (D.C.Cir.1990).

2. Block estimated that over one-half (57.8%) of all female job-seekers of Thomas' age find work within three months; within six months, four out of five (82.2%) are re-employed. By the end of two years, virtually all women of Thomas' age (99.9%) have found new work.

3. Wertheimer did report, however, that Rita Raymond should have found temporary work comparable to that found by Julie Taylor–Bland within six months of her termination. He offered no explanation why Thomas also could not have eventually found such work.

asserted by NFLPA for Thomas' discharge and the acrimony displayed by parties throughout this litigation convince me that this is such a case. Moreover, it would be inappropriate to order reinstatement where, as here, the economic harm to the plaintiff that resulted from defendant's wrongful conduct had subsided more than six years before the date of judgment.

An appropriate order accompanies this memorandum.

### ORDER

For the reasons given in the accompanying memorandum, it is this 23rd day of July, 1996, hereby **ordered** that:

1. Judgment will be entered for plaintiff Valerie Thomas and against defendant in the amount of $70,840, with prejudgment interest on that amount from January 1, 1996, to the date judgment is entered, calculated at the prime rate of interest. Plaintiff may submit an appropriate form of judgment.

2. Judgment is hereby entered for defendant and against plaintiffs Rita Raymond and Julie Taylor–Bland.